1   IRELL & MANELLA LLP
2   John C. Hueston (164921; jhueston@irell.com)
    Michael Fehner (207312; mfehner@irell.com)
3   840 Newport Center Drive, Suite 400
4   Newport Beach, CA 92660-6324
    Telephone:  (949) 760-0991
5   Facsimile:   (949) 760-5200

6
    STATE COMPENSATION INSURANCE FUND
7   Linda S. Platisha (195281; lsplatisha@scif.com)
8   1750 E. Fourth Street, Suite 450
    Santa Ana, CA 92705
9   Telephone:  (714) 347-6130
    Facsimile:   (714) 347-6145
10

11  Attorneys for *Plaintiff* STATE COMPENSATION
12  INSURANCE FUND, a Public Enterprise Fund
    and Independent Agency of the State of California
13
                UNITED STATES DISTRICT COURT
14
                CENTRAL DISTRICT OF CALIFORNIA
15
                     SOUTHERN DIVISION
16

17  STATE COMPENSATION INSURANCE  )  Case No. 13-00956 AG (CWx)
    FUND,                          )
18                                 )
                    Plaintiff,     )  **[OPPOSITION, MOTION 2 OF 2]**
19                                 )
           v.                      )  **PLAINTIFF STATE FUND'S**
20                                 )  **OPPOSITION TO MOTION TO**
    MICHAEL D. DROBOT, SR., *et al.*,)  **DISMISS OF SURGICAL**
21                                 )  **DEFENDANTS**
                    Defendants.    )  **[DOC. NO. 43]**
22                                 )
                                   )
23                                 )
                                   )  [Opposition 1, Objections to RJN
24                                 )  submitted concurrently]
                                   )
25                                 )
                                   )  Date:  November 18, 2013
26                                 )  Time: 10:00 a.m.
                                   )  Ctrm.: 10D
27                                 )  Judge: Hon. Andrew J. Guilford
28  _____  )

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES...........................................1

I.      INTRODUCTION .................................................................................1

II.     ARGUMENT .......................................................................................1

    A.      *Noerr-Pennington* And The Litigation Privilege Are
        Inapplicable ...............................................................................1

        1.      The Gravamen Of This Complaint—Defendants'
            Fraudulent Billing—Is Not Protected Under *Noerr-*
            *Pennington* ...................................................................2

        2.      Even If *Noerr-Pennington* Applies, Defendants'
            Conduct Falls Within The Sham Exceptions.............................6

        3.      Defendants' Fraud Is Unprotected By The Litigation
            Privilege ..........................................................................7

    B.      State Fund's RICO Claim Is Sufficiently Pleaded................................8

        1.      State Fund Adequately Pleads Defendants' Fraud ...................10

            (a)      Spinal Implant Scheme................................................10

            (b)      Unbundling/Upcoding Scheme .....................................13

            (c)      RNFA Scheme................................................14

            (d)      Autologous Transfusion Scheme ..................................15

            (e)      Spinal X-Ray Double Billing .......................................16

         2.      State Fund Adequately Pleads A Cognizable RICO
            Injury..............................................................................16

         3.      State Fund Adequately Pleads Justifiable Reliance.................17

         4.      State Fund Adequately Pleads The RICO Enterprise...............19

III.    CONCLUSION ..................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barton's Disposal Service, Inc. v. Tiger Corp.*,
   886 F.2d 1430 (5th Cir. 1989)..................................................................4

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ...............................................................................17

*Castleman v. Sagaser*,
   216 Cal. App. 4th 481 (2013).................................................................3

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001)...............................................................................22

*Comwest, Inc. v. American Operator Services, Inc.*,
   765 F. Supp. 1467 (C.D. Cal. 1991)................................................20, 21

*CPM, LLC v. Zenith Insurance Company*,
   669 F. Supp. 2d 1152 (C.D. Cal. 2009)............................................3, 5

*Diaz v. Gates*,
   420 F.3d 897 (9th Cir. 2005)...........................................................16, 17

*Edwards v. Centex Real Estate Corp.*,
   53 Cal. App. 4th 15 (1997).........................................................1, 2, 7, 8

*Elliott v. Foufas*,
   867 F.2d 877 (5th Cir. 1989)...........................................................20, 21

*Grauberger v. St. Francis Hospital*,
   169 F. Supp. 2d 1172 (N.D. Cal. 2001) ................................................12

*Haliban v. WCAB*,
   68 Cal. Comp. Cases 1867, 2003 Cal. Wrk. Comp. LEXIS 590
   (Dec. 4, 2003) .........................................................................................4

*In re Jamster Marketing Litigation*,
   2009 WL 1456632 (S.D. Cal. May 22, 2009)....................................20, 21

*In re Toyota*,
   785 F. Supp. 2d 883 (C.D. Cal. 2011)...................................................23

*In re WellPoint*,
   865 F. Supp. 2d 1002 (C.D. Cal. 2011)....................................19, 20, 21

*Jewel v. Nat'l Sec. Agency*,
   673 F.3d 902 (9th Cir. 2011)..................................................................17

*Kifle-Thompson v. State Bd. of Chiropractic Examiners*,
   208 Cal. App. 4th 518 (2012).................................................................14

- ii -

**Page(s)**

*Kottle v. Northwest Kidney Ctrs.*,
  146 F.3d 1056 (9th Cir. 1998) .......................................................................... 6

*Kunz v. Patterson Floor Coverings, Inc.*,
  67 Cal. Comp. Cases 1588, 2002 Cal. Wrk. Comp. LEXIS 1605
  (Cal. WCAB Dec. 5, 2002) ............................................................................ 11

*La Jolla Beach & Tennis Club v. Industrial Indem. Co.*,
  9 Cal. 4th 27 (1994) ......................................................................................... 4

*Lee v. Gen Nutrition Cos.*,
  2001 WL 34032651 (C.D. Cal. Nov. 26, 2001 ............................................. 23

*LiMandri v. Judkins*,
  52 Cal. App. 4th 326 (1997) ............................................................................ 8

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
  431 F.3d 353 (9th Cir. 2005) ......................................................................... 18

*Lujan v. Nat'l Wildlife Fed.*,
  497 U.S. 871 (1990) ....................................................................................... 17

*Lustiger v. United States*,
  386 F.2d 132 (9th Cir. 1967) .................................................................... 10, 12

*Neder v. United States*,
  527 U.S. 1 (1999) ........................................................................................... 17

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) ........................................................... 9, 19, 20, 21

*Olszewski v. Scripps Health, Inc.*,
  30 Cal. 4th 798 (2003) ..................................................................................... 8

*People ex rel. Allstate v. Muhyeldin*,
  112 Cal. App. 4th 604 (2003) ........................................................................ 14

*Premier Medical Management Systems v. California Insurance*
  *Guaranty  Association*,
  136 Cal. App. 4th 464 (2006) .......................................................................... 5

*River City Markets, Inc. v. Fleming Foods West, Inc.*,
  960 F.2d 1458 (9th Cir. 1992) ....................................................................... 22

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) ........................................................................... 2

*State Compensation Insurance Fund v. Khan*
  (C.D. Cal. July 30, 2013) ........................................................................ passim

*Theofel v. Farey-Jones*,
  359 F.3d 1066 (9th Cir. 2003) ......................................................................... 2

- iii -

**Page(s)**

*United States Fidelity & Guar. Co. v. Lee Investments LLC,*
    641 F.3d 1126 (9th Cir. 2011) ........................................................................ 4

*United States v. Benny,*
    786 F.2d 1410 (9th Cir. 1986) ................................................................ 22, 23

*United States v. Bohonus,*
    628 F.2d 1167 (9th Cir. 1980) ...................................................................... 10

*United States v. Feldman,*
    853 F.2d 648 (9th Cir. 1988) ................................................ 19, 20, 21, 23

*United States v. Goldin Indus.,*
    219 F.3d 1271 (11th Cir. 2000) .................................................................... 22

*United States v. Turkette,*
    452 U.S. 576 (1981) ...................................................................................... 19

*United States v. Woodley,*
    9 F.3d 774 (9th Cir. 1993) ............................................................................ 10

*United States v. Woods,*
    335 F.3d 993 (9th Cir. 2003) ........................................................................ 10

*Westways World Travel, Inc. v. AMR Corp.,*
    265 F. App'x 472 (9th Cir. 2008) ................................................................ 13

**Statutes**

18 U.S.C. § 1962(c) .......................................................................................... 16

42 CFR § 413.53(b) .......................................................................................... 15

42 CFR §§ 412(c) ............................................................................................. 15

Cal. Code Regs. tit. 8, § 9789.22 ....................................................... 11, 12, 15

Cal. Lab. Code § 4600 ..................................................................................... 11

Cal. Lab. Code § 4904(a) ............................................................................. 5, 6

Cal. Pen. Code § 550 ................................................................................ 12, 14

State Fund's Second Opposition (Surgical Defendants' Motion to Dismiss)
Case No. 13-00956 AG (CWx)

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

As noted in State Fund's first opposition brief answering the main arguments of the Pharmacy Defendants ("Pharm. Opp.," Section IV), State Fund is facing two very similar motions by two groups of defendants.  Defendants refused State Fund's request to file a consolidated brief, so State Fund was forced to file two oppositions.  In the first, State Fund has summarized its position, provided background and the legal standard of review, and explained why the Defendants' contentions are incorrect as to the WCAB's jurisdiction, previous settlement agreements, and the statute of limitations.  In this second opposition, State Fund responds to Defendants' remaining arguments, which were emphasized by the Surgical Defendants.  Here, State Fund explains why neither the *Noerr-Pennington* doctrine nor California's litigation privilege bars this action (Section II.A), and explains why all RICO elements are satisfied (Section II.B).

## II.   ARGUMENT

### A.   *Noerr-Pennington* **And The Litigation Privilege Are Inapplicable**

In addition to Defendants' argument that State Fund's fraud and RICO claims should be sent to the WCAB, they also assert that State Fund cannot sue them *at all*.  Defendants argue that every bill they send to State Fund is protected petitioning under the *Noerr-Pennington* doctrine (Pharm. Mot. at 20:14–22:21; Surg. Mot. at 7:17–10:16), and California's litigation privilege (*id.* at 10:17–11:14).

Not so.  Accepting these arguments would convert their submission of a bill to an insurer into protected activity no matter how remote the possibility of that bill one day becoming the subject of a lien.  As explained in *Edwards v. Centex Real Estate Corp.*, "[s]uch an extension of the [litigation] privilege would effectively permit a [provider] to lie or make fraudulent miscommunications any time a claim is made, on the theory that the claim *might* ripen into an actual lawsuit.  Such an extension of the privilege would swallow up much of the law of torts."  53 Cal. App.

4th 15, 32 (1997).  "Such an approach would effectively condone fraud and deceit once any tort has been committed or claim has been made, on the theory that litigation 'might' result."  *Id.* at 37.  Submitting bills hardly reflects a "dispute," let alone an "imminent lawsuit."  Defendants do not enjoy absolute immunity.

> 1.  The Gravamen Of This Complaint—Defendants' Fraudulent Billing—Is Not Protected Under *Noerr-Pennington*

"[T]he [*Noerr-Pennington*] doctrine is typically invoked to immunize the act of petitioning itself—i.e., the filing of the lawsuit."  *Theofel v. Farey-Jones,* 359 F.3d 1066, 1078 (9th Cir. 2003).  Defendants effectively concede, as they must, that their submission of bills to State Fund is not itself petitioning activity before the WCAB.  *See* Surg. Mot. 9:19–20.  Although *Noerr-Pennington* "has been extended to certain conduct 'incidental to the prosecution of the suit,'" it does not extend to all interactions between parties that eventually may end up in litigation.  *Theofel*, 359 F.3d at 1078 (doctrine did not even protect service of an invalid subpoena); *cf. Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934–35 (9th Cir. 2006) ("conduct incidental to the prosecution of the suit" may only be protected if it is "sufficiently related to petitioning activity") (cited in Surg. Mot. at 8, 10, 17, and merely finding that tort causes of action could not be premised on a pre-litigation demand letter).

In an attempt to categorize their fraudulent billing as "petitioning" or "pre-petitioning" activity, Defendants assert that every single bill falls within the ambit of *Noerr-Pennington*: "Once defendants submit bills for reimbursement of medical services rendered to injured workers, the WCAB is implicated and the activity becomes protected."  Pharm. Mot. at 22:13–14; *see also* Surg. Mot. at 9:19–20 (it is "plainly impossible to meaningfully separate . . . billing activity from direct petitioning activity at the WCAB.").   Under this theory, any and every business invoice between a buyer and a seller constitutes protected petitioning activity.  The law has not adopted this absurdity, however; there is no protection for false bills or fraudulently induced settlements.  The submission of a business invoice for payment

1  is wholly distinct from the possibility that good-faith petitioning activity may arise

2  from it in the future, and the further possibility that further activity surrounding that

3  invoice may eventually be protected.  *See Castleman v. Sagaser*, 216 Cal. App. 4th

4  481, 492 (2013) (in anti-SLAPP context, defendant must show gravamen of the

5  claim is protected petitioning activity—"the fact that plaintiffs' claims are related to

6  or associated with defendant's litigation activities is not enough.").

7      As the Central District correctly held in *Khan*, the fact that "[r]esort to an

8  action before the WCAB was . . . necessary after the initial attempts to defraud State

9  Fund were unsuccessful" does not convert submissions into petitioning or pre-

10  petitioning activity.  Ex. A to Pharm. Opp., Order, *State Compensation Insurance

11  Fund v. Khan* (C.D. Cal. July 30, 2013) ("*Khan*") at 13–14.  *Khan* confirms the

12  logical separation that exists between the submission of (fraudulent) bills and

13  possible petitioning activity—if sending a bill constituted protected pre-petitioning

14  activity, any distinction between conduct "antecedent" to WCAB proceedings

15  (which is not protected) and activity within WCAB proceedings (which may be

16  protected if not a sham) is meaningless.  State Fund's claims are not directed at

17  WCAB or judicial proceedings, but target fraudulent bills.  *See* FAC ¶ 64 n.10.

18      Both Defendants cite *CPM, LLC v. Zenith Insurance Company*, 669 F. Supp.

19  2d 1152 (C.D. Cal. 2009), in which the Central District *denied* a motion to dismiss

20  based on *Noerr-Pennington*, separating (a) petitioning activity before the WCAB,

21  which may be protected; and (b) "activity that may have been conducted antecedent

22  to and without contemplation of litigation before the WCAB," which is not (and

23  which is involved here).  *Id*. at 1168.

24      Plaintiff CPM (a Pharmacy Defendant here) alleged that defendant insurers

25  had engaged in "lulling" conduct by "induc[ing] CPM into believing that they

26  intended to resolve CPM's claims in good faith" and "falsely communicat[ing] to

27  other carriers and administrators that CPM was being investigated for fraud or

28  illegal practices."  *Id*.  The court concluded that such conduct does not "necessarily

2896335

concern[] petitioning activity before the WCAB," and thus *Noerr-Pennington* protection did *not* apply to these allegations.  *Id.*  ("If the SAC's allegations are taken as true, then Defendants' fraudulent conduct predated their protected petitioning activity, such that the WCAB process was merely a vehicle to effectuate Defendants' scheme.").  Defendants ignore this holding, citing instead the court's observation that when CPM overreached so far as to allege that the defendant insurers committed misconduct *in actual WCAB filings and proceedings*, *Noerr-Pennington* would dispose of such claims.  *Id.* at 1167–68.  The court merely recognized that the insurer had the right to object to those bills at the WCAB and engage in consolidation proceedings.  *See id.* at 1168.

Defendants' act of filing liens is not the problem; their pre-existing fraudulent bills are.  Defendants completely overlook the patent distinction between petitioning the government for a redress of grievances, and submitting bills as a matter of everyday business.  A bill may *possibly* become the subject of a WCAB proceeding—just as a contract may *possibly* become the subject of a breach of contract action.  But this attenuated connection falls far short of the "sufficiently close" connection required for *Noerr-Pennington* protection.  *See, e.g.*, *Barton's Disposal Service, Inc. v. Tiger Corp.*, 886 F.2d 1430 (5th Cir. 1989) (doctrine did not extend to predatory pricing unrelated to the defendant's petitioning activities).

Moreover, there is no potential of interfering with the integrity of the WCAB (as existed in *CPM*, because the provider was suing insurers for the actual arguments insurers made in their own defense at the WCAB).  State Fund's RICO and fraud claims cannot be heard by the WCAB, and State Fund is not seeking such damages there.  *See* Pharm. Opp., Section V.A.3 (citing *United States Fidelity & Guar. Co. v. Lee Investments LLC*, 641 F.3d 1126, 1135 (9th Cir. 2011)); *La Jolla Beach & Tennis Club v. Industrial Indem. Co.*, 9 Cal. 4th 27, 35 (1994); *Haliban v. WCAB*, 68 Cal. Comp. Cases 1867, 1871–72, 2003 Cal. Wrk. Comp. LEXIS 590

(Dec. 4, 2003), all of which affirm WCAB's inability to hear actions for tort damages); *cf. CPM*, 669 F. Supp. 2d at 1168.

There is simply no precedent affording Defendants absolute immunity for their bills, despite Defendants' attempt to make it up, such as Surgical Defendants' quote of *Premier Medical Management Systems v. California Insurance Guaranty Association*, 136 Cal. App. 4th 464, 473 (2006). There, the court related that "*Defendants argue that* the entire process of submitting bills and lien claims for medical services in pending WCAB cases is inherently part of the WCAB litigation process," but the Surgical Defendants leave out the italicized words. Surg. Mot. at 9:12–14. The court did not adopt such a broad view. Instead, it focused on the pleadings and found that "the gravamen of the complaint is that after Premier (a billing company) submitted plaintiff physicians' bills to defendant insurers for payment, and filed liens in numerous workers' compensation cases before the WCAB, defendants collectively conspired to contest, delay, and avoid payment of these bills and liens." *Id.* at 470. In holding that *Noerr-Pennington* barred the complaint, the court emphasized that "[t]he gravamen of the complaint is defendants' successful activity in petitioning the WCAB to stay processing of workers' compensation bills and lien claims by plaintiffs." *Id.* at 479. Again, the providers could not sue to prevent the insurers from defending themselves by filing a petition for coordination and stay at the WCAB. *CPM* held the same and it is true here (Defendants cannot sue State Fund for moving to consolidate and stay Defendants' lien proceedings at the WCAB).

Defendants want to transform bills into liens. *Cf.* Surg. Mot. at 9:10–12. They are not the same—bills are merely invoices while liens can only be filed after a bill's submission, processing, and negotiation, with an attestation of formal proof before the WCAB. *CPM* confirms this distinction. 669 F. Supp. 2d at 1168. The Surgical Defendants' citation to Labor Code section 4904(a) merely shows how far they are willing to stretch citations. Section 4904(a) states that a claim by an

injured employee to the *Employment Development Department* (EDD) for unemployment compensation may be treated as a lien against any compensation awarded. Thus, where the EDD has made a payment for an industrial injury covered by workers' compensation, Section 4904(a) allows the EDD to recover it, by treating EDD's bill as a lien. This section has absolutely no application to a medical lien filed by a provider before the WCAB. Further, it does not matter whether the employee has begun a WCAB action before a provider provides services, and it certainly does not matter whether an employee has "petitioned" his employer (rather than the government) for benefits. *Cf.* Surg. Mot. at 8:26–9:9. A provider is not given greater rights based on whether an employee has filed a claim, nor is the insurer stripped of its right to sue, and there is and can be no allegation that all of the thousands of examples of the fraudulent schemes provided by State Fund involve ongoing cases. They do not. *See id.* at 9:5–6 (admitting that only sometimes has the employee submitted a workers' compensation claim before a bill is sent). State Fund is injured by making payments (as well as the time taken to process fraudulent claims), and the injury does not hinge on anything the *employee* does or files.

> ## 2. Even If *Noerr-Pennington* Applies, Defendants' Conduct Falls Within The Sham Exceptions

Even assuming that *Noerr-Pennington* applies to Defendants' conduct, State Fund has properly pleaded that their activity before the WCAB falls within the sham exceptions to the doctrine. State Fund's allegations show that Defendants "engaged in a pattern of petitions before the [WCAB] without regard to the merit of the petitions," and "[Defendants]' misrepresentations before the [WCAB] deprived the entire [WCAB] proceeding[s] of [their] legitimacy." *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1062–63 (9th Cir. 1998) (cited in Surg. Defs.' Mot. at 8, in which "vague allegations of misrepresentation" were insufficient to prove the sham exception; Defendants cannot plausibly argue the FAC and the examples therein are vague).

- 6 -

Although Defendants were sometimes able to complete their fraud on the first pass (the initial bill), when they were unable to do so, they resorted to misusing the WCAB process to further the pre-existing fraud.  *E.g.*, FAC ¶ 152.  Each of Defendants' claims for compensation that they knew were not owed constitutes an "objectively baseless" claim.  *See, e.g.*, *Rock River Comm'n, Inc. v. Universal Music Grp., Inc.*, --- F.3d ---, 2013 WL 5227079, at *7 (9th Cir. Sept. 18, 2013) (a claim is "objectively baseless" where claimant knew it did not have rights in the subject of the claim).  Defendants filed such meritless claims repeatedly throughout the course of their scheme, doing so when they were not licensed, knew that other Defendants or entities were asserting the same claim, or had pumped up invoices by using shell companies and morphing entities.  *See, e.g.*, FAC ¶¶ 64, 147, 152.  In filing each of the claims based on fraudulent bills, Defendants misrepresented to the WCAB that they were owed money not actually owed.  As the Central District found in *Khan* (Pharm. Mot., Ex. A, at 13–14), claims filed with the WCAB without regard to merit and resultant settlements fall within the sham exception to the *Noerr-Pennington* doctrine.  Thus, even if *Noerr-Pennington* may apply (and it does not), State Fund should be allowed to proceed with its claims.  *E.g.*, *Rock River*, 2013 WL 5227079, at *7 ("whether the sham exception to the *Noerr–Pennington* doctrine applies is a question of fact") (citation omitted).

            3.    Defendants' Fraud Is Unprotected By The Litigation Privilege

The Surgical Defendants also assert that all "alleged conduct occurred in the course of or in anticipation of litigation" before the WCAB, and therefore, State Fund's state claims are barred by California's litigation privilege.  Surg. Mot. at 11:3–5.  The argument mirrors the *Noerr-Pennington* assertions, and similarly fails.

"More than a mere possibility or vague 'anticipation' of litigation [is] required for the privilege to attach, or else the privilege may be misused in ways for which there is no public policy justification or purpose."  *Edwards*, 53 Cal. App. 4th at 33.  For the privilege to apply (1) "the communication must have been made

- 7 -

preliminary to a *proposed* judicial or quasi-judicial proceeding," (2) "the verbal proposal of litigation must be made *in good faith*," (3) "the contemplated litigation must be *imminent*," and (4) "the litigation must be proposed in order to obtain access to the courts *for the purpose of resolving the dispute*." *Id.* at 34–35 (emphases in original).  The mere submission of bills cannot meet this high standard.  In *Edwards*, the fact that plaintiffs' complaints could have possibly ripened into litigation did not convert defendants' settlement letters into protected speech.  *Id.* at 32.  Indeed, Defendants' argument rests on the assumption that any bill submitted to State Fund would be turned by Defendants into a lien, *regardless of its underlying merits* – thus negating the element of good faith emphasized by *Edwards*, and further painting any threatened WCAB action as a sham.  Further, Defendants' main case of *Olszewski v. Scripps Health, Inc.*, 30 Cal. 4th 798 (2003), does not sweep all of Defendants' bills under the litigation privilege.  Surg. Mot. at 10–11 (painting *Olszewski* as allowing an "absolute privilege" for "steps taken prior to" proceedings).  There, the defendant's only alleged misconduct was the filing of a statutorily authorized lien; the court made clear that "the gravamen of plaintiff's complaint is . . . the assertion of liens." *Id*. at 831.  The court distinguished prior authority rejecting the application of the litigation privilege, where the protected conduct was "only one act in the overall course of conduct alleged." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 345 (1997) (quoted in *Olszewski*, 30 Cal. 4th at 831).

Here, too, a bill may eventually ripen into proceedings before the WCAB, but the submission of a bill cannot be deemed a pre-litigation activity.  The mere possibility of a dispute and WCAB proceedings does not bring Defendants' submission of fraudulent bills under the litigation privilege.

## B. State Fund's RICO Claim Is Sufficiently Pleaded

This is the rare case in which the level of specificity in the FAC has gone virtually unchallenged.  The Surgical Defendants hinge their RICO defense on the notion that no law or principle limits what they may bill State Fund.  (The Pharmacy

- 8 -

Defendants do not challenge the RICO elements as to their schemes.)  In claiming their fact-laden "defense," the Surgical Defendants assert and admit:

- They need not adhere to reimbursement limits set by the OMFS or related regulations.  Even if so, this "technical issue of regulatory interpretation," regardless of any deceptive effect or intent, somehow cannot be fraud as a matter of law (Surg. Mot. at 14:15–18, 16:3–11, 18:4–5);

- Defendants' bills were allowed to be unreasonable because Defendants never said otherwise (*id.* at 15:3–4);

- Defendants unbundled items were required to be bundled by the OMFS and other regulations, but they are not subject to the regulations, as it is up to State Fund to determine the correct payment amount (*id.* at 16:13–17);

- Defendants failed "to catch the expiration of a minor billing code" (*id.* at 17:9–10); and

- Double-billing may have occurred through Defendants' failure to pay a vendor (*id.* at 18:17–21).

These admissions, corroborated by State Fund's painstakingly gathered and detailed data, confirm a pattern of conduct RICO was meant to prevent.

Defendants do not argue that State Fund has failed to plead the use of U.S. mail and wires.  *E.g.*, FAC ¶ 166 (Pacific Hospital "caused the fraudulent use of United States mail and interstate wires by sending thousands of fraudulent bills and invoices via U.S. Postal Service or electronically"); *id.* ¶¶ 51–55, 63, 65–66, 73, 79, 81, 84, 88, 167–68 (and lodged examples).  State Fund has also sufficiently alleged specific intent for each Defendant.  *See, e.g.*, FAC ¶ 55 ("Pacific Hospital, the Individual Defendants, and International Implants created and provided such fraudulent invoices to State Fund . . . in order to induce State Fund to overpay for spinal implants."); FAC ¶¶ 73, 74, 80, 85, 89, 166–67; *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (general allegations of intent to deceive are sufficient).  Instead, Defendants largely argue the facts and say they did nothing

1  wrong.  But this is a Rule 12(b)(6) motion, and regardless of the high burden they

2  face at this stage, Defendants misapprehend key elements of RICO, as well as the

3  law limiting their ability to engage in misconduct.

4             1.     State Fund Adequately Pleads Defendants' Fraud

5       "A scheme or artifice to defraud," may be based on a statutory or regulatory

6  violation—as when a defendant fails to make disclosures required by a regulation.

7  *E.g.*, *United States v. Woodley*, 9 F.3d 774, 778 (9th Cir. 1993) ("Woodley's mail

8  fraud convictions were based on a violation of the 'related-party' regulation.").  Yet

9  RICO does not *require* a statutory or regulatory violation—a scheme to defraud may

10 be *any* scheme reasonably calculated to deceive.  *United States v. Bohonus*, 628

11 F.2d 1167, 1172 (9th Cir. 1980) ("it is only necessary for the government to prove

12 that the scheme was calculated to deceive persons of ordinary prudence.").  "The

13 fraudulent nature of the 'scheme or artifice to defraud' is measured by a non-

14 technical standard. . . .  [S]chemes are condemned which are contrary to public

15 policy or which fail to measure up to the reflection of moral uprightness, of

16 fundamental honesty, fair play and right dealing in the general and business life of

17 members of society.'" *Id.* (quotation omitted).  Thus, "deceitful statements of half-

18 truths or the concealment of material facts is actual fraud violative of the mail [or

19 wire] fraud statute[s]." *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967);

20 *accord United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003).

21            *(a)*    *Spinal Implant Scheme*

22      State Fund sufficiently alleges "a scheme or artifice to defraud" by identifying

23 in detail Defendants' spinal implant scheme and explaining how it was designed to

24 deceive.  *See* FAC ¶¶ 39–59.  For example, Defendants "create[d] the illusion that

25 Pacific Hospital actually pays the grossly inflated prices" on International Implants'

26 invoices.  FAC ¶ 45; *see also* FAC ¶ 44 ("These charges are fraudulent because

27 Pacific Hospital actually pays only a small percentage of the prices reflected on

28 International Implants' invoices.").  Defendants also "misrepresented that . . . the

- 10 -

costs Pacific Hospital purportedly incurred in purchasing implants from International Implants were the actual and reasonable cost of the implants, when in the fact the prices on the invoices were much greater than the prices actually paid to manufacturers," and misrepresented that Pacific Hospital and International Implants were independent companies conducting bona fide transactions.  FAC ¶ 49.

Defendants argue that Pacific Hospital never represented the prices reflected on International Implants' invoices as "reasonable," only as its "documented paid costs."  Surg. Mot. at 14–15.  But Defendants ignore a critical point:  Pacific Hospital does *not* actually pay the purported "documented paid costs."  FAC ¶ 44.

Moreover, by submitting the invoices to State Fund, Defendants *did* represent International Implants' invoices as reasonable.  Defendants argue that Cal. Code Regs. tit. 8, § 9789.22 allows a provider to bill any amount as long it documents its paid costs—even if, according to Defendants, the receipt is prepared by and the "costs" paid to an entity owned and operated by the same individuals as the provider.  Surg. Mot. at 13:7–17; 3:25–4:9.  Not so.  The regulation sets only the *maximum* reimbursement rate owed to a provider.  *See* 8 CCR § 9789.22(a) (the fee is "the maximum reimbursement to a hospital for inpatient medical services . . . .").  But regardless of the maximum under the regulation, by law the fee must still be reasonable.  *See Kunz v. Patterson Floor Coverings, Inc.*, 67 Cal. Comp. Cases 1588, 1598, 2002 Cal. Wrk. Comp. LEXIS 1605, at *27 (Cal. WCAB Dec. 5, 2002) ("[A]ny facility fee must still be 'reasonable'") (citing Cal. Lab. Code § 4600).

Defendants ignore that, by submitting invoices from International Implants without disclosing the numerous links between Defendants and their related entities, they represented these transactions were on the up and up.  They were not.  *See* FAC ¶ 49.  By Defendants' design, the scheme hinged on outsiders' reasonable belief that the two companies conducted arm's-length transactions.  *Id.*  Defendants knew that State Fund would have rejected their excessive bills had it known the invoices were from Pacific Hospital's related shell company.  FAC ¶¶ 49–50, 55–56, 151–52.

- 11 -

Because the companies' common ownership was material to the reasonableness of Pacific Hospital's fees, Defendants had a statutory duty to disclose the relationship. *See* Cal. Pen. Code § 550(b)(3) ("It is unlawful to . . . [c]onceal, or knowingly fail to disclose the occurrence of, any event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled."). Instead, it took a detailed State Fund investigation to find that when Pacific Hospital purchased the same items from someone other than International Implants, its "documented paid costs" were up to 80% less. FAC ¶ 46. Defendants cannot excuse themselves by arguing that "State Fund was . . . free to object and litigate its claims regarding Pacific Hospital's bills at the WCAB." Surg. Mot. at 15. State Fund has a right to bring an action for fraud, not just dispute amounts at the WCAB. *See* Pharm. Opp., Section V.A.

Furthermore, Defendants' purported interpretation of Section 9789.22 not only contradicts its text but is irrelevant here, as it ranges far outside the pleadings into factual (or counter-factual) denials. Regardless, Defendants are wrong that "the alleged mail and wire fraud is based on nothing more than a disputed interpretation or construction of a statute or regulation." Surg. Mot. at 14. Defendants' repeated misrepresentations that they actually paid the "documented paid costs" is fraud under any interpretation, and the law holds that any scheme "reasonably calculated to deceive" is actionable, with or without a regulatory or statutory violation. *E.g.*, Cal. Pen. Code §§ 550(a)(6), (b)(3); *Lustiger*, 386 F.2d at 138. While a violation of a statute or regulation is not needed for the predicate acts of wire or mail fraud, such violations *can and do* demonstrate a scheme to defraud when surrounded, as here, with a particularized showing of thousands of examples. Defendants' authorities do nothing to dispute (and actually confirm) State Fund's right to sue and move past the pleading stage. *Cf. Grauberger v. St. Francis Hospital*, 169 F. Supp. 2d 1172, 1177 (N.D. Cal. 2001) (legitimate issue of interpretation arose where "state and federal trial courts have had differing opinions on this unsettled issue of state law, and there

- 12 -

1    is no published state law precedent"); *Westways World Travel, Inc. v. AMR Corp.*,

2    265 F. App'x 472, 474 (9th Cir. 2008) (*summary judgment* affirmed when it was

3    undisputed that defendant had actually "communicated its interpretation of the

4    contracts . . . and demanded payment pursuant to this interpretation.") (both cited in

5    Surg. Mot. at 14, 15).  Defendants did not communicate honestly here, and may be

6    sued for it.  FAC ¶¶ 44–45, 49.

7        Finally, Defendants include a misleading argument about "pass through"

8    reimbursement.  Surg. Mot. at 13.  Contrary to Defendants' description, pass-

9    through reimbursement concerned a law allowing hospitals to collect reimbursement

10    for spinal implants under two separate statutory provisions, as State Fund explained

11    in its FAC (¶ 40).  Defendants suggest, however, that "pass through reimbursement"

12    refers to reimbursement for implants that have passed through a middleman such as

13    International Implants.  It does not; the former reimbursement structure had nothing

14    to do with using shell entities to artificially inflate reimbursements— it referred to

15    passing actual paid costs to an insurer, which Defendants did not do.  *See id.*

16                    *(b)    Unbundling/Upcoding Scheme*

17        State Fund sufficiently details Defendants' unbundling and upcoding schemes

18    and explains precisely how they are designed to deceive State Fund.  As an example

19    of upcoding, Pacific Hospital administered toxicology tests but repeatedly billed

20    them using CPT codes reserved for "confirmatory" testing.  FAC ¶ 70.  Each time it

21    did this, Pacific Hospital misrepresented the type of services it provided, and it

22    intended each time to deceive State Fund into paying for services it never actually

23    provided.  FAC ¶ 63.  As for unbundling, the "practice amounts to double-billing on

24    the bundled elements."  FAC ¶ 62.  Thus, each time Defendants submitted an

25    unbundled bill, they misrepresented the services provided, and they again intended

26    each time to deceive State Fund into paying for services not provided.  FAC ¶ 62.

27        Defendants argue that the workers' compensation laws do not prohibit them

28    from submitting unbundled or upcoded bills, saying that the "California Legislature

2896335

1   (and the administrative director) have not required that medical providers bill at the

2   rate provided under the OMFS."  Surg. Mot. at 16.  They contend that they are thus

3   free to ignore entirely the reimbursement limits set by the OMFS, including any

4   limits on bundled services and services with CPT codes.

5        Not true.  In *People ex rel. Allstate v. Muhyeldin*, the court affirmed a finding

6   of insurance fraud under California Penal Code section 550 against providers for

7   doing what Defendants insist they can do with impunity: submitting upcoded bills.

8   112 Cal. App. 4th 604, 612 (2003).  There, the jury was presented with two theories

9   of fraud: using false codes to "represent[] that a particular exam was more

10  comprehensive than that actually performed" and, by upcoding, "knowingly

11  bill[ing] for services that were never performed."  *Id.*  *Allstate* shows that the use of

12  a "code" is a representation of the services performed; using the wrong code is a

13  *mis*representation.  *See also Kifle-Thompson v. State Bd. of Chiropractic Examiners*,

14  208 Cal. App. 4th 518, 530 (2012) ("unbundled or upcoded billing . . . contained

15  fraudulent misrepresentations designed to maximize profits by circumventing

16  reimbursement limits established by the Workers' Compensation system").  State

17  Fund pleads the same theories of fraud as *Allstate*.  *See, e.g.*, FAC ¶ 61 ("The

18  Surgical Defendants represented that higher and more complex services were

19  provided than actually were.").  They are actionable.

20                    *(c)    RNFA Scheme*

21       State Fund pleads Defendants' RNFA scheme in detail.  Payment for RNFA

22  services is already included ("bundled") in the OMFS fee for inpatient medical

23  services, and Pacific Hospital is not allowed to separately charge for the services of

24  an RNFA during spinal surgery.  FAC ¶¶ 76–77.  Pacific Hospital repeatedly billed

25  its RNFAs as "assistant surgeons," and State Fund alleges that it did so with the

26  intent to deceive State Fund into paying more for phantom services.  FAC ¶¶ 75–80.

27       Defendants argue that the fee schedule they submit as Exhibit 10 includes a

28  modifier (code "83") to bill "services provided from licensed non-physician health

- 14 -

care providers," and argue they properly did so.  Surg. Mot. at 17 (citing RJN, Ex. 10 at 36).  This outdated version of the OMFS, apparently from the 1990s, says that "[t]he Schedule *shall not* apply to inpatient medical services provided by employees of a health facility," because there was no applicable fee schedule for inpatient services in the 1990s.  *See* Surg. Mot. RJN, Ex. 10 at 34, 1st column (emphasis added); *see also* Objs. to Surg. Mot. RJN.  Yet ever since Cal. Code Regs. tit. 8, §§ 9789.20 *et seq*. was adopted into the current OMFS in 2004, inpatient surgical centers cannot bill nurses as assistant surgeons.  Now, for inpatient medical services, "California's OMFS . . . *already* accounts for services performed by RNFAs in setting reimbursement rates for inpatient services."  FAC ¶ 76 (emphasis added, and explaining how California regulations like Cal. Code Regs., tit. 8, § 9789.22, modeled after Medicare regulations (42 CFR §§ 412(c), 413.53(b)), provide that routine nursing services are part of inpatient costs and are not to be billed separately).  Thus, by billing using the old modifiers in Exhibit 10, Defendants are "double-bill[ing] the services provided by its RNFAs"—under the bundled inpatient rate, and then separately.  FAC ¶ 75.  If Defendants had billed the RNFAs as RNFAs and not assistant surgeons, that would expose the unbundling.  *See* FAC ¶¶ 75, 78.  Defendants deny that they knowingly violated the law, claiming "a technical issue of regulatory interpretation" (Surg. Mot. at 17:9–10) or that their schemes were caused by "mere confusion" (*id*. at 19:29–34).  Not only are these arguments irrelevant at the pleading stage, but the confluence of "technical issues" Defendants repeatedly raise to justify their conduct support the existence of the fraudulent schemes and the fraudulent intent behind them.

### *(d)    Autologous Transfusion Scheme*

State Fund has sufficiently pleaded "a scheme or artifice to defraud" concerning the transfusion scheme.  Pacific Hospital refused to pay third-party providers for autologous transfusion services, but it billed State Fund as though it had paid the third parties.  FAC ¶¶ 82–85.  Each time it did this, Pacific Hospital

- 15 -

misrepresented the services for which it is entitled to reimbursement, and it intended each time to deceive State Fund into paying for such services.  *Id.*  The Surgical Defendants, assuming State Fund's omniscience as a matter of law, say "State Fund could not have relied on the bona fides of such billing under the OMFS regardless of its source, given that the face of the bill stated a nonreimbursable, unbundled charge."  Surg. Mot. at 18:19–21.  Yet plainly, the scheme relies on separate bills from separate entities – from Pacific Hospital and from third parties, sometimes months apart for the same procedure.  FAC ¶¶ 82–85.  Again, the argument that Defendants did nothing wrong yet State Fund should have detected the problem immediately does nothing to prove the lack of fraud as a matter of law, but only shows the contradictions inherent in these excuses.

(e)   *Spinal X-Ray Double Billing*

State Fund has sufficiently pleaded the X-Ray double billing scheme as well.  Almost exactly like Pacific Hospital's transfusion scheme, Long Beach Pain did not pay the third-party provider for the radiology services, yet it billed State Fund as though it had.  FAC ¶¶ 87–89.  Each time it did this, Long Beach Pain misrepresented the services for which it is entitled to reimbursement.  *Id.*  Indeed, the Surgical Defendants *admit* that "the facts alleged *plausibly suggest a wrongful intent to double bill* on the part of the vendor," but contains no explanation why this wrongful intent does not attach to them.  Surg. Mot. at 19:3–4 (emphasis added).  The Surgical Defendants fail to refute the allegations in this Rule 12(b)(6) context.

2.   State Fund Adequately Pleads A Cognizable RICO Injury

A RICO plaintiff need only allege that he was "injured in his business or property by reason of a violation of section 1962."  *Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir. 2005).  State Fund has done so.  *E.g.*, FAC ¶ 175 ("Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused State Fund substantial injury to business and property by causing State Fund to overpay millions of dollars in inflated reimbursements.").  Defendants cite *Diaz* for the illogical idea that

- 16 -

"[f]inancial losses, in and of themselves, are insufficient to demonstrate injury." Surg. Mot. at 12. They assert—with no explanation or analysis—that "even if State Fund had paid the alleged excessive charges, that still would have amounted to nothing more than a financial loss, not the requisite injury to State Fund's business or property interest." *Id*. at 15. These assertions are completely upside down; of course financial losses demonstrate injury. *Diaz* simply distinguishes personal injuries from injuries to business or property—financial losses *from personal injuries*, such as emotional distress, are not cognizable RICO injuries. *See Diaz*, 420 F.3d at 899–900. But here, State Fund alleges harm to its property *and* financial loss via business fraud. FAC ¶ 175; s*ee Diaz*, 420 F.3d at 900 ("[Plaintiff] . . . has alleged both the property interest and the financial loss" and therefore pleads a cognizable injury). Defendants' pattern of racketeering wrongfully deprived State Fund of money, a cognizable RICO injury. Further, "[g]eneral factual allegations of injury resulting from the defendant's conduct may suffice, as we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 (9th Cir. 2011) (*quoting Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)). State Fund has easily met the applicable pleading standards by demonstrating precisely how and when it was defrauded and hurt.

### 3. State Fund Adequately Pleads Justifiable Reliance

The Surgical Defendants argue that State Fund has not adequately pleaded justifiable reliance on their misrepresentations for the upcoding/unbundling scheme. Surg. Mot. at 16:23–17:8. Yet they admit, as they must, that "a plaintiff need not always show that it personally relied on a misrepresentation," *id*. at 12:21–23, making this partial argument inappropriate for a motion to dismiss. Reliance is not a required element of a RICO claim predicated on mail and wire fraud. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 640 (2008) (citing *Neder v. United States*, 527 U.S. 1, 24–25 (1999)) ("Using the mail to execute or attempt to execute

- 17 -

a scheme to defraud is indictable as mail fraud, and hence a predicate racketeering act under RICO, even if no one relied on the misrepresentation.").

Even if reliance were a required element of State Fund's RICO claim, "the issue of justifiable reliance is ordinarily a question of fact to be determined by a trial court or jury." *E.g.*, *Otano v. Ocean*, 2013 WL 2370724, at \*4 (C.D. Cal. May 30, 2013); *see also Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 363 (9th Cir. 2005) (district court "improperly granted judgment on the pleadings on the question of reasonable reliance" because there "exist[ed] a triable factual issue."). Here, State Fund sufficiently alleges justifiable reliance on Defendants' misrepresentations for each of the alleged schemes—*i.e.*, that it actually paid Defendants' excessive charges in full or in part, reasonably relying on Defendants' misrepresentations. *E.g.*, FAC ¶¶ 55–56 (spinal implants); ¶ 73 (upcoding), ¶ 80 (RNFA), ¶ 85 (transfusion), ¶ 89 (radiology).

Defendants argue that, as a matter of law, State Fund *could not* have relied on Defendants' misrepresentations because State Fund did not always pay the face amount of their bills. Surg. Mot. at 16 (citing FAC ¶¶ 60, 64). This contention rests on the Surgical Defendants' assertion of State Fund's omniscience: "no specific intent to defraud can be attributed to the Surgical Defendants *when they know State Fund cannot be deceived*." Surg. Mot. at 17:6–7 (emphasis added). Unless the Court agrees with the Surgical Defendants that, as a matter of law, State Fund "cannot be deceived," detrimental reliance is sufficiently alleged.

Moreover, Defendants mischaracterize the FAC. Paragraph 60 explains that "State Fund generally pays for a particular procedure . . . at the rate authorized by the OMFS and other regulations," and paragraph 64 explains that "State Fund generally pays the approved rates" when it receives an upcoded or unbundled bill. Put simply, State Fund tries to comply with workers' compensation laws and to avoid wasting taxpayers' money. But that does not mean that Defendants are incapable of deceiving State Fund. As the FAC explains, State Fund does not have

2896335

unlimited resources and faces a massive number of bills each day, so that detecting fraud at the time a bill is received is difficult if not impossible, especially given Defendants' methods of concealment.  FAC ¶ 153.  Defendants similarly argue that State Fund could not have justifiably relied on their misrepresentations because "State Fund reviews the propriety of each bill before payment."  Surg. Mot. at 16 (citing FAC ¶¶ 30–31).  Again, this misrepresents the pleading as well as reality.  *See, e.g.*, FAC ¶ 30 (indicating constraints of review and processing).

State Fund has demonstrated how Defendants got away with manipulating the system until the breadth of the fraud was unearthed.  Defendants cannot argue that State Fund's reliance is implausible.  *See Otano*, 2013 WL 2370724, at *4.

### 4.   State Fund Adequately Pleads The RICO Enterprise

Establishing a RICO "enterprise" is "not very demanding."  *Odom*, 486 F.3d at 548.  An associated-in-fact enterprise is "'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  *Id*. at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "To establish the existence of such an enterprise a plaintiff must provide both 'evidence of ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'"  *Id*. (quoting *Turkette*, 452 U.S. at 583).

Defendants contend that State Fund alleges "conclusory" common purposes and that "[s]uch a formulaic recitation of the elements of a cause of action will not do."  Surg. Mot. at 20.  Defendants are wrong again.  For example, the Ninth Circuit has found an association-in-fact enterprise where the members shared "the purpose of defrauding insurance companies and others through repeated acts of arson."  *United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988); *see also In re WellPoint*, 865 F. Supp. 2d 1002, 1033 (C.D. Cal. 2011) (plaintiffs "plausibly show the existence of an associated-in-fact enterprise" when "the common purpose of the alleged enterprise was to 'reduce the price paid for [out-of-network services], and increase the profits of the Enterprise participants and the Insurer Conspirators.'").

State Fund sufficiently alleges that the Surgical Defendants formed an association-in-fact enterprise, "an ongoing organization . . . that associated for common and shared purposes, including: (a) fraudulent overbilling of spinal implants; (b) fraudulent overbilling of medical services; (c) deriving increased profits from the activities of the enterprise; and (d) concealing the fraudulent nature of the enterprise's activities." FAC ¶ 161; *id.* ¶¶ 162–63 (showing ongoing organization and continuity). The enterprise members shared purposes like those in *Feldman* and *WellPoint*: to defraud State Fund through "the fraudulent overbilling of medical services," "submitting bills well in excess of what the law provides" and "deriving increased profits from the activities of the enterprise." FAC ¶ 161.

Defendants contend that specific facts must be pleaded establishing the existence of an enterprise. *E.g.*, Surg. Mot. at 20:12–13 (citing *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989)). This is not the law in the Ninth Circuit: the notice standards of Rules 8 and 12 apply to enterprise allegations, while the higher standard of Rule 9 applies to the actual wire and mail fraud allegations. *Odom*, 486 F.3d at 545. Defendants' substantive cases are also entirely off base. In *Elliot*, the court rejected the plaintiff's "merely conclusory" allegations because plaintiff had alleged multiple enterprises without alleging organizational characteristics or continuity for any of them. 867 F.2d at 881. Similarly, *Comwest, Inc. v. American Operator Services, Inc.*, merely held that the plaintiff failed to plead an association-in-fact enterprise because it did not "allege the existence of any centralized decision-making authority or common personnel," thus preventing the court from "infer[ring] the existence of common financial interests or connections." 765 F. Supp. 1467, 1476 (C.D. Cal. 1991). Finally, *In re Jamster Marketing Litigation* held that while defendants could share "the common purpose of increasing their revenues by fraudulent means," plaintiffs had failed to allege those means with particularity. 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009).

1   Unlike *Elliot* and *Comwest*, State Fund alleges the Surgical Defendant

2   Enterprise's organizational characteristics and continuity by pleading a "centralized

3   decision-making authority," "common personnel," and "allegations from which [to]

4   infer the existence of common financial interests or connections." *Comwest*, 765 F.

5   Supp. at 1467.  The FAC explains that the Surgical Defendants are commonly

6   owned and controlled, and that they all share financial interests and even a common

7   address.  FAC ¶¶ 13–14.  *See also Feldman*, 853 F.2d at 658 (association-in-fact

8   enterprise existed where multiple corporations were commonly owned and

9   controlled, "overlap[ped] in personnel and organizational structure," and "shared

10  financial connections").  And unlike *Jamster*, State Fund alleges the schemes with

11  particularity, explaining numerous ways in which Defendants defrauded State Fund,

12  down to thousands of particular bills and five interrelated methods of fraud for the

13  Surgical Defendants, each with (at least) dozens of examples.  *See* FAC ¶¶ 39–90.

14   Citing *WellPoint*, Defendants argue that "[t]he mere existence of a general

15  business relationship is insufficient" for the purpose of alleging an enterprise

16  between Pacific Hospital and Long Beach Pain.  Surg. Mot. at 20:24–25.  But State

17  Fund alleges much more than a general business relationship.  State Fund has

18  alleged, for example, Drobot Sr.'s common ownership and financial interest in

19  Pacific Hospital and Long Beach Pain, their overlapping schemes, and that they

20  share the same office building.  FAC ¶¶ 13–14, 35.  Further, there is and was cross-

21  referral of patients: "Long Beach Pain use[d] outside radiology services on

22  numerous occasions, often on claimants involving Pacific Hospital as well."  FAC

23  ¶ 87.  Given these details of a the comprehensive scheme, the allegation that Pacific

24  Hospital and Long Beach Pain worked together to defraud State Fund is more than

25  sufficiently plausible.  Further, continuity does not "require that every member be

26  involved in each of the underlying acts of racketeering, or that the predicate acts be

27  interrelated in any way."  *Odom*, 486 F.3d at 552 (quotations omitted); *see also*

28  *Feldman*, 853 F.2d at 659 ("[I]t is not necessary that all the members of an

- 21 -

1  enterprise have participated throughout its life.").  Thus, every Surgical Defendant

2  Enterprise member need not work with every other member as long as "the

3  participants overlap to a significant degree."  *Id.*  State Fund sufficiently alleges that

4  Pacific Hospital and Long Beach Pain worked together.

5         Finally, the Surgical Defendants incorrectly argue that State Fund has not

6  sufficiently pleaded "distinctiveness" under RICO, complaining that an employee

7  and an employer cannot form an enterprise.  Surg. Mot. at 19 (citing *River City*

8  *Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992)).

9  That is neither the point nor a basis for State Fund's FAC.  "The prohibition against

10 the unity of person and enterprise applies only when the singular person or entity is

11 defined as both the person and the only entity comprising the enterprise."  *United*

12 *States v. Goldin Indus.*, 219 F.3d 1271, 1275 (11th Cir. 2000).  With the Surgical

13 Defendants, State Fund pleads an association-in-fact enterprise comprised of Pacific

14 Hospital, HealthSmart, International Implants, Long Beach Pain, Drobot Sr., and

15 Drobot Jr.  FAC ¶ 160.  Defendants argue that "the mere fact that Drobot Senior

16 may own or control" Pacific Hospital and Long Beach Pain "is not sufficient to

17 create a cognizable enterprise."  Surg. Mot. at 21:4–5.  But under controlling law, an

18 individual *is* distinct from the companies he owns.  *Cedric Kushner Promotions,*

19 *Ltd. v. King*, 533 U.S. 158, 163 (2001) ("The corporate owner/employee, a natural

20 person, is distinct from the corporation itself, a legally different entity with different

21 rights and responsibilities due to its different legal status. And we can find nothing

22 in the statute that requires more 'separateness' than that."); *United States v. Benny*,

23 786 F.2d 1410, 1415–16 (9th Cir. 1986).  In *Benny*, the Ninth Circuit rejected the

24 defendant's argument that he could not have formed an enterprise with his

25 company—a sole proprietorship—and its employees.  The court explained that

26 because the sole proprietorship employed others it was not merely an extension of

27 the defendant or a "one-man show," but a distinct entity.  *Id.* at 1415.  And "[i]f one

28 corporation possesses an existence separate from its incorporator, clearly a group of

- 22 -

1  corporations formed by a defendant is also distinct." *Feldman*, 853 F.2d at 656

2  (citing *Benny*, 786 F.2d at 1415–16).  Defendants' cases holding that a corporate

3  employer and an employee are not distinct are wholly inapposite; here, the owners

4  direct and take profits from a number of interrelated companies.  *Cf. In re Toyota*,

5  785 F. Supp. 2d 883, 922 (C.D. Cal. 2011); *Lee v. Gen Nutrition Cos.*, 2001 WL

6  34032651, at *14 (C.D. Cal. Nov. 26, 2001).  Messrs. Drobot remain distinct from

7  these corporate entities; they can—and have—formed an association-in-fact

8  enterprise with them.

9  **III.   CONCLUSION**

10  　　　　Defendants' fraudulent billing activity does not come within the ambit of

11  either the *Noerr-Pennington* doctrine or the litigation privilege.  The act of

12  misrepresenting services provided or costs paid is not a sufficient prerequisite, or

13  even related to, petitioning activity or protected litigation.  Nor can Defendants

14  ignore the detailed pleadings of the RICO fraudulent schemes, each of which was

15  reasonably calculated to deceive State Fund.   Defendants' attempt to assert

16  additional facts or excuses fail, and they are simply wrong that they can do whatever

17  they wish when billing State Fund.  Finally, for the reasons set forth in the

18  Pharmacy Opposition, State Fund's timely claims are properly before this Court.

19  Accordingly, the Surgical Defendants' Motion to Dismiss should be denied, and if

20  the Court finds any issues are not sufficiently pleaded in the FAC, State Fund

21  respectfully asks for leave to amend.

22  Dated:  October 21, 2013                      Respectfully submitted,

23                                                IRELL & MANELLA LLP

24

25

26                                      By:_____/s/ John C. Hueston_____

27                                          John C. Hueston
                                            Attorneys for Plaintiff
28                                          State Compensation Insurance Fund

- 23 -