1
2
3
4
5
6
7
8                          **UNITED STATES DISTRICT COURT**

9                    **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11   **STATE COMPENSATION**                  )     CASE NOS.   SACV 13-0956 AG (JCGx);
     **INSURANCE FUND,**                     )                      SACV 15-1279 AG (JCGx)
12                                            )
                   Plaintiff,                 )
13                                            )     **ORDER DENYING MOTION FOR**
              v.                              )     **RECONSIDERATION AND**
14                                            )     **DISCUSSING DISQUALIFICATION**
     **MICHAEL D. DROBOT SR. ET AL.**         )
15                                            )
                   Defendants.                )
16                                            )
     _____          )
17                                            )
     **STATE COMPENSATION**                   )
18   **INSURANCE FUND,**                      )
                                              )
19                 Plaintiff,                 )
                                              )
20            v.                              )
                                              )
21   **DANIEL CAPEN ET AL.**                  )
                                              )
22                 Defendants.                )
     _____          )
23
24
25
26
27
28

This matter concerns whether a lawyer can represent—at the same time, in the same litigation, in the same courthouse—a criminal and his victim.

Being a defendant—particularly a criminal one—can be lonely. As a society, we don't require a defendant's friends to stand by the defendant. We don't require a defendant's parents to stand by the defendant. We don't require a defendant's children to stand by the defendant. We don't even require a defendant's spouse to stand by the defendant, though that spouse is often someone who took an oath to do so.

But a lawyer is different. Representing a client creates an unshakable loyalty that can still persist when bonds of friendship and family fail. There's a practical reason for this. A lawyer needs to know the worst facts to give clients the best advice. Clients can't feel comfortable providing such candor unless they know their lawyer is absolutely committed to advancing the clients' interests and advocating against the conflicting interests of others. Though the rest of the world may be united against them, clients need to know that at least their lawyer will reliably remain in their corner, even in the face of great temptation.

The importance and impact of loyalty in the attorney-client relationship extends beyond the client and counsel, to courts too. Judges are often confronted with important issues and difficult disputes. Under our system of law, judges rely on adversarial advocates to help ensure that courts reach the right results in these situations. Adversarial advocacy assumes that lawyers are fiercely loyal in representing their clients. If that loyalty doesn't exist, the engine of our legal system can't run. Justice can't be administered.

And the importance and impact of loyalty in the attorney-client relationship extends even further—beyond clients, beyond counsel, beyond courts—to our country itself. We live

in a nation governed by the rule of law. We've constructed a powerful government to administer that law—a government that can deprive a person of property, liberty, and even life. But unlike governments of men, which depend on might, our government of law ultimately depends on the consent of the governed for its continued existence. The public must trust that the government and the legal system that undergirds it are fair and just. Lawyers serve as both stewards and servants of that trust. Since well before the law was an industry, our society looked to the profession to safeguard a complex system that keeps our country going. When the loyalty of a lawyer to a lawyers' clients comes into question, the public can lose faith in both the justice system and the bar that purportedly protects it. So while maintaining private confidences, a lawyer must sustain the public's confidence. In this way a lawyer leads two lives, both bound by loyalty.

Given all this, it's easy to see why a lawyer's duty of loyalty is a duty recognized in the common law of every jurisdiction of the United States. It's easy to see why a lawyer's duty of loyalty is codified in every significant American code of legal ethics ever promulgated. It's easy to see why a lawyer's duty of loyalty is the most fundamental of all duties a lawyer owes a client. And it's easy to see why so much is endangered when a lawyer lets opportunity affect that loyalty.

This matter presents a uniquely complex situation that requires the extensive review that follows. That review conclusively reaffirms what might otherwise be considered a commonsense proposition. That is, the duty of loyalty is improperly and impermissibly compromised when one law firm represents—at the same time, in the same litigation, in the same courthouse—a criminal and his victim. That's what happened here, and if the Court had allowed it to continue, loyalty would have been lost in ways that the client would not—and sometimes could not—understand until after harm had been done. Thus, there

3

could be no informed waiver .

## 1.    INTRODUCTION

Defendants stand accused of conspiring to defraud plaintiff State Compensation Insurance Fund ("SCIF") by submitting fraudulent insurance bills and providing or receiving illegal kickbacks. The litigation arising out of this purported scheme involves dozens of defendants, two civil suits and a criminal suit, and well over a thousand filings spanning three years and three dockets.

The most recent round of motion practice focused on the question already posed about whether here a law firm could represent a criminal and his victim. Since the answer was no, on March 22, 2016, the Court granted a motion for disqualification ("Motion for Disqualification") filed by defendants Lokesh Tantuwaya and Dr. Lokesh Tantuwaya, M.D., Inc. (collectively, "Tantuwaya"). The Court disqualified the law firm of Hueston Hennigan LLP from representing SCIF (the alleged victim) in this litigation given its concurrent representation of Paul Randall (an admitted criminal perpetrator). SCIF filed a motion for reconsideration ("Motion for Reconsideration").

The Court DENIES the Motion for Reconsideration. The previous disqualification remains, and the previous tentative opinion is expanded here to further explain why disqualification is required.

**2.      BACKGROUND**

A review of the relevant law is, of course, necessary and helpful. But before discussing the applicable legal standards, it's important to understand that this litigation is uniquely complex in ways that may limit the applicability of some case law, particularly since one client here has the Sixth Amendment right to counsel for those facing criminal charges. Cases like this are reassuringly rare. Here's a summary.

**2.1      The Civil Side of this Litigation**

SCIF provides California employers with workers' compensation insurance policies. Under those policies, SCIF reimburses medical providers that treat employees who get sick or injured on the job. According to SCIF, various medical providers—including doctors, clinics, and marketers—schemed to defraud SCIF by submitting fraudulent insurance bills for medical services, medical hardware, and medications. There were several components to the alleged scheme. Medical providers allegedly entered into contracts to inflate the costs of medical procedures and medications. Medical providers allegedly paid kickbacks to doctors for referring patients to preferred facilities or for using preferred products or medications. Medical providers allegedly entered into illegal fee-sharing agreements. And medical providers allegedly overbilled SCIF for medical services.

In June 2013, SCIF filed a lawsuit ("SCIF 1") against a key architect of the alleged scheme, Michael D. Drobot Sr., as well as other alleged co-conspirators. In March 2015, those defendants filed a third-party complaint seeking indemnity from other medical providers, including various doctors and their associated entities. In July 2015, the Court granted SCIF leave to file an amended complaint that named as defendants the parties who

were already named as third-party defendants in the third-party complaint. Accordingly, in its third amended complaint ("TAC"), SCIF added twenty-eight of the third-party defendants. But notably, SCIF didn't add Randall, even though Randall was named as a third-party defendant in the third-party complaint.

In August 2015, SCIF filed another lawsuit ("SCIF 2") raising similar allegations against other medical providers that the Court didn't allow SCIF to add in SCIF 1. Again, notably, SCIF didn't add Randall as a defendant.

Let's summarize. By the end of August 2015, there were two operative complaints—the TAC in SCIF 1 and the complaint in SCIF 2. In SCIF 1, there was also an amended action for equitable indemnity ("CC/FATPC") between the cross-defendants and four other third-party defendants not named in the TAC. Notably, Randall is a defendant in the CC/FATPC.

In November 2015, the Court heard motions to dismiss the TAC and CC/FATPC in SCIF 1, a motion for summary judgment in SCIF 2, and motions to dismiss the complaint in SCIF 2. In December 2015, the Court denied those motions.

### 2.2    The Criminal Side of this Litigation

Federal prosecutors were also involved in the litigation arising out of the alleged fraudulent scheme, even before they filed motions to intervene in SCIF 1 and SCIF 2. In April 2014, Drobot Sr. pled guilty to workers' compensation fraud against SCIF and others. In November 2015, the U.S. Department of Justice announced that the government had charged five other individuals in the same kickback scheme. According to the government's

press release, all five criminal defendants were cooperating in the government's ongoing investigation of the scheme, dubbed "Operational Spinal Cap." The government's press release stated that

> [t]he schemes involved tens of millions of dollars in illegal kickbacks to dozens of doctors, chiropractors and others. As a result of the illegal payments, thousands of patients were referred to Pacific Hospital in Long Beach, where they underwent spinal surgeries that led to more than $580 million in bills being fraudulently submitted during the last eight years of the scheme alone. Many of the fraudulent claims were paid by the California worker's compensation system and the federal government.

Randall was charged for his involvement in that scheme. As the government's press release states,

> Paul Richard Randall, 56, of Orange, California, a health care marketer previously affiliated with Pacific Hospital and Tri-City Regional Medical Center in Hawaiian Gardens, pleaded guilty on April 16, 2012, before Judge [Josephine L.] Staton to conspiracy to commit mail fraud. Randall, who admitted recruiting chiropractors and doctors to refer patients to Tri-City in exchange for kickbacks, is scheduled to be sentenced on April 8, 2016. . . . Randall, who also facilitated the Pacific Hospital scheme by introducing doctors to Drobot [Sr.] and coordinating kickback arrangements, pleaded guilty to participating in a separate, similar scheme involving Tri-City Regional Medical Center.

Randall hasn't been sentenced yet.

7

In January 2016, the United States moved to intervene in SCIF 1 and SCIF 2 to modify several subpoenas and restrict discovery requests. The Court granted the motions with modifications, noting the three cases' overlap and the "countless ways" certain civil discovery requests could thwart the government's ongoing criminal investigation into the fraud. The Court was also persuaded that some of the information defendants sought was protected by the law enforcement privilege.

### 2.3    The First Motion to Disqualify

Back in July 2014, the Court denied a motion to disqualify Plaintiff's counsel—at the time, the law firm Irell & Manella LLP—filed by pharmacy defendants. Between May 2010 and June 2011, an Irell & Manella partner exchanged over a hundred emails with Michael R. Drobot Jr., a current defendant. The partner had advised Drobot Jr. about buying three pharmacy defendants from Drobot Sr., who is his father and a current defendant. In June 2013—two years after the partner left Irell & Manella—Irell & Manella agreed to represent the current plaintiff, SCIF. The firm did not have knowledge of the former partner's emails or the conflict. In a nineteen page order, the Court denied the motion to disqualify Irell & Manella because there wasn't enough evidence to show that confidential information was conveyed to the firm. The Court stated that the motion posed a "close question," but ultimately held that disqualification was inappropriate.

### 2.4    The Second Motion to Disqualify

The most recent motion to disqualify also sought to disqualify Plaintiff's counsel—at the time, Hueston Hennigan LLP. Although the firm name had changed, SCIF's attorneys

hadn't. In January 2015, John Hueston and Brian Hennigan, along with thirty or so other lawyers, left Irell & Manella to form Hueston Hennigan. There Hueston and other lawyers continued to represent SCIF. During a December 2015 mediation session, Tantuwaya's counsel learned that Hennigan represented Randall, one of the third-party defendants in SCIF 1, perhaps beginning as early as 2010 or 2011. This conflict only came to light after Judge Staton unsealed Randall's criminal case in late November 2015. Hennigan has maintained that he only represented Randall in his criminal case, and not in the civil cases before this Court. According to Hennigan, attorney Anthony Graham of Graham & Martin LLP has been representing Randall in the civil cases.

Tantuwaya filed the most recent motion for disqualification based on Hueston Hennigan's concurrent representation of Randall and SCIF. Before filing the motion, Tantuwaya and SCIF met and conferred through each party's counsel. During that meeting, SCIF threatened to seek sanctions against Tantuwaya's counsel for filing the motion. SCIF did not mention that it had gotten conflict waivers from both Randall and SCIF. A few defendants joined the motion. Many other defendants represented by larger law firms did not.

The gist of Tantuwaya's motion was straightforward. He pointed out that Hueston Hennigan was representing SCIF, the victim of a fraud, and Randall, a perpetrator of that fraud, at the same time in the same litigation arising out of the same fraud. He argued that this representation created conflicts of interest that required the Court to disqualify Hueston Hennigan from representing SCIF.

The Court considered everything the parties submitted, including not only the motion, opposition, and reply, but also sur-replies, sur-sur-replies, supplemental declarations,

and other typically-disallowed documents that the Court allowed the parties to file. Based on those filings and before the hearing on the motion for disqualification, the Court issued a detailed, nineteen page tentative opinion for the parties' benefit. The Court then provided the parties more than ninety minutes of oral argument to address the tentative. SCIF argued for much, and perhaps a majority, of that time.

After reviewing all that, the Court issued a short order granting the motion to disqualify. Stating the obvious, this inherently meant that the Court denied SCIF's request for sanctions against Tantuwaya's counsel. The Court promised the parties that it would issue a longer opinion further explaining the decision to disqualify. This is that opinion.

**2.5     The Motion for Reconsideration**

SCIF then filed the Motion for Reconsideration, which precipitated another round of papers and another lengthy hearing, this one spilling over from the morning into the afternoon.

That brings us to the present. After considering about a thousand pages of documents and more than four hours of oral argument on this disqualification issue, the Court confirms that disqualification was appropriate and necessary here, while finding no grounds for the Motion for Reconsideration.

## 3.     THE SECOND MOTION TO DISQUALIFY

### 3.1     Legal Standard

"The authority of a trial court to disqualify an attorney derives from the power inherent in every court to control in furtherance of justice, the conduct of its ministerial officers." *City & Cty. of San Francisco v. Cobra Sols., Inc.*, 38 Cal. 4th 839, 846 (2006) (alteration and internal quotation marks omitted) (quoting *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1139 (1999)). California's ethical rules, including applicable California state court decisions and the Rules of Professional Conduct of the State Bar of California, provide guidance about when courts should disqualify attorneys. *See* L.R. 83-3.1.2. But "it is relatively unimportant whether the status or misconduct claimed to warrant disqualification is proscribed by a particular ethical norm or disciplinary rule or may be characterized [instead] as a failure to avoid the appearance of impropriety." *Gregori v. Bank of Am.*, 207 Cal. App. 3d 291, 308 (1989), *modified* (Feb. 17, 1989).

Although there are competing interests to consider when disqualification is at issue, one interest arises above all others. "[D]isqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility." *SpeeDee Oil*, 20 Cal. 4th at 1145. But "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *Id.* Accordingly, "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *Id.*

### 3.2    Analysis

This Court must exercise its inherent power in furtherance of justice in part to protect important duties like loyalty, and to avoid the appearance of impropriety.

As noted, loyalty means a lot for litigants, their lawyers and the law generally. "Attorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process. The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel." *Id.* at 1146 (citation omitted).

So it's not surprising that a lawyer's unfaithfulness is unacceptable. California's ethics rules generally bar an attorney from representing clients with adverse interests. *See* Cal. Rules of Prof'l Conduct 3-310(C). That general rule is true regardless of whether there's an actual or merely potential conflict between the clients. *See id.*

Loyalty is a particularly important consideration when a lawyer is thinking of concurrently representing clients with adverse interests. Concurrent representation of clients with adverse interests raises different, and arguably more serious, ethics concerns than successive representation. *See Ontiveros v. Constable*, 245 Cal. App. 4th 686, 700 (2016).

This is true even when the attorney is concurrently representing the clients in unrelated matters. That's why the California Supreme Court held in *Flatt v. Superior Court* that

[i]n evaluating conflict claims in [concurrent] representation cases, the courts have . . . imposed a test that is more stringent than that of demonstrating a substantial

12

relationship between the subject matter of successive representations. Even though the simultaneous representations may have nothing in common, and there is no risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be required. Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or "automatic" one.

*Flatt v. Superior Court*, 9 Cal. 4th 275, 284 (1994) (footnote omitted). "[R]epresentation adverse to a present client must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients." *Unified Sewerage Agency of Wash. Cty., Or. v. Jelco Inc.*, 646 F.2d 1339, 1345 (9th Cir. 1981) (discussing concurrent representation under the old ABA Code of Professional Responsibility).

But if the representations do happen to have something in common, concurrent representation is even less appropriate. In another case, the California Supreme Court remarked that

[t]he most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation. Such patently improper dual representation suggests to the clients—and to the public at large—that the attorney is completely indifferent to the duty of loyalty and the duty to preserve confidences.

*SpeeDee Oil*, 20 Cal. 4th at 1147 (citing *Flatt*, 9 Cal. 4th at 284 n.3). It is "patently improper" for "attorneys in the same firm to represent adverse parties in the same litigation." *Id.* at 1139 (citing *Flatt*, 9 Cal. 4th at 284 n.3). In these situations, courts don't typically analyze whether

13

the representations are substantially related, as disqualification is automatic for a concurrent conflict of interest even on "wholly unrelated" matters. *See Flatt*, 9 Cal. 4th at 283.

With these considerations in mind, the Court analyzed how this actual, adverse, concurrent representation conflict interfered with the Court's ability to ensure both the actuality and appearance of justice.

### 3.2.1   Standing

First, there was a question about standing. "As a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *Kasza v. Browner*, 133 F.3d 1159, 1171 (9th Cir. 1998) (internal quotation marks omitted) (quoting *United States v. Rogers*, 9 F.3d 1025, 1031 (2d Cir. 1993)). Preliminarily, the reference here to "former client" suggests successive representation. Indeed, requiring a client or former client to complain would limit the ethical review of concurrent representations, since the parties remain aligned with their counsel. SCIF argued that all of the moving defendants lacked standing to bring the motion for disqualification since none had ever been clients of Hueston Hennigan.

But the courts in this state and the parties in this litigation—including SCIF—have acknowledged that there are exceptions to the general rule. When there is an ethical breach "so severe that it 'obstructs the orderly administration of justice,' the party who finds his claims obstructed has standing" to bring a motion to disqualify. *Colyer v. Smith*, 50 F. Supp. 2d 966, 972 (C.D. Cal. 1999). Put differently, "where the ethical breach so infects the litigation . . . that it impacts the moving party's interest in a just and lawful determination of her claims," the moving party can have standing to bring a motion to disqualify. *Id.* Thus, it's not

surprising for the California Court of Appeal to observe that "[c]ase law abounds with examples of orders disqualifying counsel that have not been the product of motions by present or former clients." *Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1204 (2011).

This was just one more example of the exception. Tantuwaya and the other defendants who joined his motion had standing to disqualify Hueston Hennigan because Hueston Hennigan's breach so infected this litigation that it impacted Tantuwaya's and the other defendants' ability to defend themselves against SCIF's allegations in so many ways.

First, there was discovery. Hueston Hennigan's conflict of interest had already affected Tantuwaya's and other moving defendants' efforts to get discovery from Randall. Tantuwaya stated that discovery on Randall's connection to the scheme was crucial to his defense. Several defendants, including Tantuwaya, tried to depose Randall. During Randall's deposition with Tantuwaya's counsel, Randall inconsistently invoked his Fifth Amendment privilege against self-incrimination. Although Hennigan didn't attend the deposition, it seems likely that Hennigan counseled Randall about the risks involved in talking about his participation in the scheme, and about the importance of asserting the Fifth when asked about the scheme. Of course, the attorney-client privilege protected Hennigan's communications with Randall and thus hindered the Court's ability to tease out the full effects of Hennigan's advice on Tantuwaya's discovery efforts.

The conflict had already impacted discovery in other ways too. SCIF responded to interrogatories for documents by invoking the law enforcement privilege, without identifying who held that privilege. But the law enforcement privilege didn't necessarily extend to SCIF. So was Hueston Hennigan invoking Randall's privilege on behalf of Randall's adversary?

15

Tantuwaya suggested that was the only plausible explanation why SCIF would invoke the law enforcement privilege.

Second, there was the risk of victory lost. Tantuwaya and the other moving defendants could have been robbed of a hard-fought win in this years-long litigation because of the conflict. If the third-party plaintiffs had gotten a judgment against Randall in the civil cases, Randall might have successfully moved to have that judgment set aside because he was represented elsewhere by a conflicted attorney. Similarly, if a judgment against SCIF had been obtained in the civil cases, SCIF might have successfully moved to have that judgment set aside because it was represented by conflicted attorneys. And in the criminal case, Randall could have argued that he should be allowed to change his guilty plea because his lawyer's conflict of interest deprived him of his Sixth Amendment right to counsel.

These and the other concrete, particularized harms discussed elsewhere in this opinion persuaded the Court that Tantuwaya and the other moving defendants had sufficient personal stake to bring the motion for disqualification. Tantuwaya and these defendants therefore satisfied the "irreducible constitutional minimum" of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

And even if they somehow didn't, standing still wouldn't have presented an issue here. District courts have an "inherent obligation to manage the conduct of attorneys who appear before [them] and to ensure the fair administration of justice." *Colyer*, 50 F. Supp. 2d at 972 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44 (1991)); *see also SpeeDee Oil*, 20 Cal. 4th at 1145 (discussing a trial court's inherent authority to disqualify an attorney). This obligation overrides any "prudential barrier to litigating the rights and claims of third parties," like standing. *Colyer*, 50 F. Supp. 2d at 972; *cf. Woods v. Superior Court*, 149 Cal. App.

3d 931, 936 (1983) (emphases removed) ("[D]isqualification should be ordered not only where it is clear that the attorney will be adverse to his former client but also where it appears that he might."). The Court would have honored that obligation by raising the disqualification issue on its own when it found out about the conflict, as it inevitably would have. *See, e.g., People v. Peoples*, 51 Cal. App. 4th 1592 (1997) (affirming the ability of a trial court to disqualify counsel on the court's motion). One way or another, standing wasn't a problem here. With standing satisfied, the analysis turns to the actuality and adversity of the conflict in the concurrent representation.

### 3.2.2 The Actual, Adverse, Concurrent Representation Conflict

Here, there was an actual, adverse, concurrent representation conflict, despite SCIF's arguments to the contrary. For starters, it was undisputed that Hueston Hennigan represented Randall and SCIF at the same time. It was also evident that Randall interests were and are actually adverse to SCIF's interests, for many reasons.

For example, the existence of an actual, adverse conflict uniquely explained otherwise-puzzling past events in this litigation. The Court found it curious that Hueston Hennigan didn't file any response to the government's motion to intervene and modify subpoenas. That makes sense now, because responding to the motion could have furthered either Randall's or SCIF's interests, while undermining the other's interests.

The existence of an actual, adverse conflict also explained Randall's involvement in some, but not all, parts of the litigation. The Court found it curious that SCIF didn't name Randall in the TAC, even though he was named in the third-party complaint and SCIF sued virtually all of the other third-party defendants. When the Court asked Hueston Hennigan

17

why SCIF didn't sue Randall, a Hueston Hennigan attorney responded that "for Randall's case, he is the one that they know for sure is judgment proof that they already have a judgment against." Hennigan agreed.

The Court isn't convinced that Randall is judgment proof. So what would have caused SCIF to think he was? Many reasons are troubling. For example, did SCIF think Randall was judgment proof because Hennigan knew Randall wasn't paying his legal bills, as Hennigan's statement at the hearing that "[t]his is a case, in fact, where we have reason personally to believe that Mr. Randall is judgment proof" may have suggested? Or did SCIF think Randall was judgment proof because Hennigan or another Hueston Hennigan attorney had access to Randall's financial information and shared it with the team of attorneys doing work for SCIF? These and many other possible explanations would suggest the attorneys working for Randall were breaching their duty of loyalty and sharing information with the attorneys working for SCIF in a way that improperly benefitted SCIF. The conflict had already put Hueston Hennigan in an untenable position regarding disclosure of information. On one hand, the duty of loyalty (likely including the duty to inform) dictated that the firm use the information available to it to help its clients. On the other hand, the duty of loyalty (and, as discussed later, a few of the waivers in this case) dictated that Hueston Hennigan protect their clients' confidential information. The bottom line is Hueston Hennigan was in what the California Supreme Court called "a form of zero sum game"—Hueston Hennigan attorneys had and would continue to have had knowledge that could help one client at the expense of another. *Flatt*, 9 Cal. 4th at 289.

And of course, maybe it's not Randall's purported inability to satisfy a judgment that caused SCIF to leave Randall out of the TAC. There's lots of evidence that Randall isn't judgment proof. Tantuwaya's counsel did an impressive job hunting down seemingly hidden

18

assets and other evidence that suggest Randall has significant assets, despite assertions to the contrary.

So if not because he's judgment-proof, why leave Randall out? The conflict offered many potential explanations. Maybe Hueston Hennigan thought it was clear of ethics rules so long as it didn't directly sue Randall. Or perhaps Hueston Hennigan was trying to benefit a still-solvent Randall at SCIF's expense by keeping him less involved in the civil suit. Another moving defendant, Randy Rosen, offered his own theory as to why Randall wasn't named.

> Hueston Hennigan had notice of potential Randall resources that Hueston Hennigan could have secured or pursued for SCIF's benefit. Equally important, Hueston Hennigan appears to have simply copied wholesale into its Third Amended Complaint all the cross-defendants Drobot, Sr. named in his cross-complaint with the glaring exception of Paul Randall and Dr. Gross, a doctor who had sued Randall for declaratory relief after being sent one of Randall's extortion demands. If Hueston Hennigan had sued Dr. Gross, it understood Dr. Gross would likely have brought Randall into the case thereby defeating the artificial construct Hueston Hennigan was attempting to use so it could represent both the perpetrator Randall and his victim SCIF.

It appears there are two more cross-defendants who didn't make it from the CC/FATPC to the TAC, Samuel Vidauretta and what is presumably his associated corporate entity, Prospice Group, Inc. Neither of these defendants have appeared in the case. Their existence doesn't do much to diminish the viability of Rosen's theory.

1    The Court could keep going with examples of the existence of the conflict in the civil

2    side of the litigation, like Randall's recent deposition. At that deposition, a Hueston

3    Hennigan attorney representing SCIF sought to find incriminating evidence against Randall

4    in this litigation by asking Randall pointed questions about his connection to the fraudulent

5    scheme. Among other things, the attorney asked whether a document reflected "thousands

6    of payments from PSPM to Defendant entities, doctors, and to Paul Randall" and whether

7    Randall attended meetings where payments for referring patients were discussed. Hueston

8    Hennigan's questions supported SCIF's interests in proving up the fraud, while at the same

9    time directly undermining Randall's interests in protecting himself from further criminal or

10   civil liability.

11

12   Randall was particularly vulnerable to Hueston Hennigan's attacks at the deposition

13   because there was no criminal counsel in his corner advising him. No Hueston Hennigan

14   attorney appeared at the deposition on Randall's behalf. That's perhaps because Hueston

15   Hennigan recognized how obvious the conflict would become when it had attorneys both

16   eliciting incriminating testimony from a deponent and advising that deponent about the

17   impact of that testimony on his criminal case. Randall was left to inconsistently invoke his

18   Fifth Amendment privilege against self-incrimination. Hueston Hennigan's failure to protect

19   Randall was obvious even then. According to Tantuwaya's counsel, during Randall's

20   deposition, "Mr. Randall's [civil] counsel stated that he probably should have had Mr.

21   Randall's criminal counsel attend the deposition, based on [the civil] counsel's lack of

22   familiarity with the manner in which the right against self-incrimination should be invoked."

23

24   The deposition was a preview of the sort of conflicts that would have come up at trial

25   and elsewhere. Tantuwaya submitted emails from SCIF's current counsel stating that SCIF

26   may use Randall as a witness during settlement negotiations and even at trial. It's easy to

27

28                                                        20

envision SCIF needing Randall to testify but Randall needing to assert the Fifth. What would Hueston Hennigan have done then?

Difficulties arising from the conflict kept cropping up even in unexpected places. There was recently a motion for approving a settlement under California Code of Civil Procedure sections 877 and 877.6. The issue was whether a settlement between SCIF and a co-conspirator in this litigation was made in good faith so that the settling co-conspirator would be protected from indemnity actions from other co-conspirators under California law. This would include Randall, so the Court had to address the issue about whether he was adequately represented. To receive the settlement money, SCIF's interests were to establish that it was a good faith settlement. But to protect his rights, Randall's interests were to argue it was not a good faith settlement. A Hueston Hennigan attorney found it appropriate to submit a declaration on behalf of SCIF, but that declaration was contrary to the interests of one of Hueston Hennigan's other clients, Randall.

All this conflict existed even ignoring the more important criminal side of this litigation, where among other things the Sixth Amendment right to counsel was implicated. SCIF repeatedly argued that its interests and Randall's interests were aligned because Randall had plead guilty and his plea agreement required him to cooperate. But under the terms of that agreement, Randall is required to cooperate with the government, not necessarily with SCIF. And even setting that aside, criminal defendants sometimes fail to fully satisfy their obligations to the government and sometimes are dishonest. This possibility for dishonesty is so significant that the model Ninth Circuit jury instructions tells jurors they "should examine the testimony of [cooperating witnesses] with greater caution than that of other witnesses." Model Criminal Jury Instructions for the District Courts of the Ninth Circuit 4.9.

21

The plea agreement may have already been breached here. As noted, Rosen is another one of the moving defendants. He argued that a declaration submitted by an expert witness retained by Randall, Albert Luna, showed that Randall had breached his plea agreement. Luna's declaration asserted that Randall and his girlfriend Christina Hernandez extorted $400,000 from another defendant, Faustino Bernadett, as "hush money," in violation of Randall's plea agreement. The Court need not decide whether these allegations are true—they already illustrate the conflict issues in this case. Would Hueston Hennigan have argued that Randall hadn't violated his plea agreement? Or would they have taken a victim's stance, and vigorously investigated whether Randall did violate the plea agreement?

There's also sentencing—perhaps the most important moment for a defendant who has pled guilty. Here, the conflict arose in many areas, denying the Court the comfort that comes from adversaries arguing issues, and most importantly, denying adequate protection to a criminal defendant facing the force of the government working to take his freedom. Several relevant things occur at a sentencing hearing.

First, the Court must calculate the guideline range. *See* U.S. Sentencing Guidelines Manual § 1B1.1 (U.S. Sentencing Comm'n 2015). Determining the applicable offense level is perhaps the most important calculation in this process. Here it is determined largely by the amount of the loss involved. *See id.* § 2B1.1. The offense level in white collar crimes like this is often very difficult to calculate. Among the questions involved are whether the defendant's conduct cause monetary harm to others, and if so, who and how much. The range of potential answers to that question here may be somewhat limited by Randall's plea agreement. But within that range, Randall's counsel should be unhampered by conflicting loyalties. He wasn't.

1

2    Then there's the important issue at sentencing of whether the offense level should be

3    reduced because of assistance provided by the defendant to the government. Under section

4    5K1.1 of the United States Sentencing Guidelines, a federal prosecutor can file a motion

5    asking a court to depart from the guideline range if a defendant provides "substantial

6    assistance in the investigation or prosecution" of someone else. *Id.* § 5K1.1. In evaluating the

7    defendant's provided assistance, knowledge of the underlying facts in the civil case would

8    likely be helpful, underscoring the relatedness of Hueston Hennigan's representations of

9    SCIF and Randall. And while the government and the defendant might argue for a lower

10   sentence, victims of criminal conduct sometimes question whether the criminal defendant

11   has assisted as much as possible and argue for higher sentences. On whose side would

12   Hueston Hennigan have placed itself?

13

14   Another issue with sentencing is determining whether a fine against the defendant is

15   appropriate. *See id.* § 5E1.2. That requires understanding the defendant's financial condition

16   A defendant's financial condition is often not adequately presented in the papers submitted,

17   and thus the Court engages in further inquiry. In this inquiry, would Hueston Hennigan have

18   assisted the Court in finding undisclosed assets or excessive spending by the defendant, thus

19   helping its client SCIF, or would it have argued that its client Randall fully and adequately

20   disclosed assets and acted properly?

21

22   Yet another issue in sentencing is restitution. This is extremely important to this

23   Court as it focuses on making victims whole and evidences a defendant's acceptance of

24   responsibility for activity that harmed others. Calculating the amount of restitution in a white

25   collar crime is related to calculating the amount of loss in determining offense level, and both

26   are challenging. *See id.* § 5E1.1. It is the Court's statutory obligation to determine the amount

27

28                                              23

1  of restitution *See id.* § 5E1.1(a). Would Hueston Hennigan have been arguing for a large

2  amount of restitution benefitting its client SCIF, or a small amount of restitution benefitting

3  its criminal defendant client Randall, who is facing decisions that will potentially affect the

4  rest of his life? SCIF argued that none of this was important because Randall has filed for

5  bankruptcy. But these debts likely would not be dischargeable in bankruptcy, especially as

6  part of a criminal sentence.

7

8      That brings the discussion back to Randall's assets and highlights how this was an

9  actual, not potential conflict. Defendants in cases like this often declare bankruptcy. Their

10 creditors often are very skeptical of their financial condition and investigate their assets. As

11 noted, that's what happened here. Tantuwaya, a potential creditor of Randall's, investigated

12 Randall's assets. The results of that investigation suggest that at sentencing, serious scrutiny is

13 necessary to determine the cooperation provided, the fine, and the restitution order.

14 Typically, lawyers help the Court get these tough questions right. But here the Court couldn't

15 count on counsel to make that happen.

16

17     Many of the other iterations of this crisis of loyalty implicated Hueston Hennigan's

18 duty to inform. If Randall sought advice from Hennigan on whether he should volunteer

19 information to the government about a particular issue that the government didn't explicitly

20 ask about, did Hueston Hennigan have to pass that information on to SCIF? If Randall

21 sought advice from Hennigan about the potential impact of an inheritance or other asset

22 coming his way, did Hueston Hennigan have to pass that information on to SCIF? This is an

23 issue that the Court dealt with as recently as this week in another case. The Court gave

24 Hueston Hennigan repeated opportunities to provide adequate answers to these critical

25 questions. The firm didn't.

26

27

28                                          24

Trying to represent a criminal defendant while representing his victim seems to present obstacles so obvious and numerous as to defy complete delineation. The Court could go on for pages more. But the Court didn't even need to look at any of this—it was evident that Randall's interests were and are directly and actually adverse to SCIF's interests because Hueston Hennigan *admitted as much*. A conflict waiver Hueston Hennigan very recently sent to SCIF stated

[a]s you also know, Randall has been named as a third-party defendant in the Drobot action. Even before Randall was named as a third-party defendant, and as we have discussed with State Fund on multiple occasions, Randall is expected to be a material witness in the Actions, and he also has potential exposure directly to State Fund. Although State Fund decided not to assert direct claims against Randall in the Actions, State Fund could still pursue such claims in a separate action, and we continue to believe that Randall will be a material witness in the Actions in any event. Of course, in light of State Fund's potential claims against Randall and Randall's alleged role as a co-conspirator in the Pacific Hospital scheme at issue in the Actions, State Fund and Randall may have, and likely do have, directly adverse interests.

### 3.2.3 Waivability

SCIF argued that all of this conflict could be cured by waivers Randall and SCIF signed. That raised two questions: was this conflict even waivable, and if so, did the waivers here show informed consent to the conflict by both parties?

First, waivability.

25

SCIF's argument that Hueston Hennigan's concurrent representation conflict is waivable stemmed in part from *Klemm v. Superior Court*. In that case, the California Court of Appeal explained that an attorney couldn't engage in "[concurrent] representation of conflicting interests if that representation is in conjunction with a trial or hearing where there is an actual, present, existing conflict and the discharge of duty to one client conflicts with the duty to another," regardless of whether there was informed consent. *Klemm v. Superior Court*, 75 Cal. App. 3d 893, 898 (1977). The court noted that it hadn't been able to find a single case with a contrary holding. *Id.* The court continued on to state that

> [a]s a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed. Such representation would be per se inconsistent with the adversary position of an attorney in litigation, and common sense dictates that it would be unthinkable to permit an attorney to assume a position at a trial or hearing where he could not advocate the interests of one client without adversely injuring those of the other.

*Id.* SCIF argued that this language means that the only unwaivable concurrent representation conflicts are in situations where an attorney is representing actually adverse parties at a single contested trial or hearing.

There was a necessary/sufficient fallacy in SCIF's argument. It's true that *Klemm* says attorneys can't concurrently represent actually adverse clients at a contested trial or hearing, regardless of whether there's a conflict waiver. But it's also true that *Klemm* doesn't say that this limitation on concurrent representation is limited to contested trials or hearings. SCIF seems to have confused a sufficient condition for unwaivable disqualification—a single contested trial or hearing—with a necessary condition of unwaivable disqualification. Put

26

differently, SCIF seems to have confused the *Klemm* court carefully addressing its discussion to the facts in front of it with the *Klemm* court limiting its discussion to just those facts. It's not surprising (and likely appropriate) that a straightforward 1977 case involving a single lawyer representing a couple in an uncontested divorce didn't address its discussion to a concurrent representation conflict in a complex, twenty-first century, multi-defendant, multi-case, multi-year litigation involving many of Orange County's finest lawyers and law firms.

SCIF's interpretation of *Klemm* made no practical sense either. SCIF seemingly read *Klemm* to allow concurrent representation of adverse parties by attorneys at all non-trial, non-hearing contested proceedings. Depositions perhaps offer the best example, but other discovery disputes, motion practice, pre-litigation communications, and all sorts of other proceedings could also absurdly escape the purported *Klemm* concurrent representation rule under SCIF's logic. SCIF appeared to acknowledge as much at oral argument on the disqualification issue, when the Court asked whether concurrent representation at a deposition was permissible under *Klemm*.

In other contexts, this might highlight an interesting question. Some commentators, including some in this case, have couched the issue of waivability as turning on whether the actual, adverse, concurrent representation barred by *Klemm* occurs in the same "lawsuit." Some have couched waivability as turning on whether the representation occurs in the same "litigation." And some have couched waivability as turning on whether the representation occurs in the same "matter." Are there meaningful distinctions between these and related terms when it comes to waivability? Neither the parties nor the Court found appropriate authority addressing this, even though the Court explicitly asked this question in an order it issued before briefing had been finished and the hearing had been held on the Motion for Reconsideration.

Here, the Court didn't need to delineate the precise answer to this complicated question. The two civil cases and the criminal case were and are effectively the same case for the purposes of this analysis for many reasons. Some reasons have already been discussed. Here are three more.

First, the cases would, under other circumstances, almost certainly all be part of the same case. The only apparent reason the criminal case is at all separated from the civil cases is because of the criminal-civil distinction. If the criminal case were another civil case instead, it would have been consolidated with the existing civil cases. The claims for civil RICO conspiracy show how the civil/criminal divide is rarely clean-cut. That divide is especially blurry here. Indeed, the recently unsealed criminal information explicitly refers to SCIF as one insurance carrier that received fraudulent bills as part of Randall's conspiracy. *See United States v. Randall*, SA CR 12-023-JLS, Dkt. No. 1. The civil cases are similarly related. The Court has repeatedly had to examine close calls regarding consolidation of the two civil cases, first through a motion to amend and then through (an-eventually-withdrawn) motion to consolidate. Then, the issues were difficult largely due to SCIF's decision to delay adding new parties. But the civil cases and criminal cases are the same litigation for all relevant purposes here.

Second, the Department of Justice's press release supports that these cases are the same litigation. Three of the defendants mentioned in the press release—Mitchell Cohen, Alan Ivar, and Philip Sobol—were also named as defendants in the TAC. The press release also referred to the entity defendants named in the TAC, including Pacific Hospital of Long Beach, Pacific Specialty Physician Management, California Pharmacy Management, and Industrial Pharmacy Management.

28

Third, the government's motion to intervene supports that these cases are the same litigation. For that motion, it was obvious to all parties involved and the Court that the government was investigating the same fraudulent scheme that SCIF alleged existed in its civil complaints. Indeed, in its moving papers, the government explicitly referred to SCIF as one victim of the $580 million healthcare fraud perpetrated by various medical providers. The government also explicitly referred to its criminal action against Randall to support its motion, stating that "[t]he criminal investigation [was] also entitled to administrative deference because it long preceded the civil actions."

Any argument that this isn't one litigation for the purpose of a waivability analysis at best adopts form over substance, and at worst invites legal shenanigans that threaten the integrity of our justice system. If an attorney represents one side in a case, can the attorney also represent the other side in the same dispute, if the attorney can finagle the rules of mandatory joinder enough to maintain a separate lawsuit? In other words, is a separate case number the cure-all for concurrent representation conflicts? Of course not—courts would rightfully admonish attorneys engaged in this behavior, and the public would rightfully question a system that allowed these things. *See SpeeDee Oil*, 20 Cal. 4th at 1144 ("[J]udges must examine [disqualification] motions carefully to ensure that literalism does not deny the parties substantial justice.")

And even if, despite all indications to the contrary, this somehow wasn't a single litigation for waivability purposes, SCIF's reasoning still might fall flat. Or rather, *Flatt*. It's not clear that SCIF's broad waiver reading of the Court of Appeal's decision in *Klemm*, limiting circumstances of unwaivability, survives the California Supreme Court's decision years later. In *Flatt*, the California Supreme Court emphasized the difficulties of concurrent representation, stating that "[e]ven though the [concurrent] representations may have *nothing*

29

in common, and there is *no* risk that confidences to which counsel is a party in the one case
have any relation to the other matter, disqualification may nevertheless be *required*." *Flatt*, 9
Cal. 4th at 284. The court noted the possibility of waiver, but stated that the class of cases
where waiver of a concurrent representation conflict was acceptable was "a rare
circumstance, typically involving corporate clients." *Id.* at 285 n.4. The court continued on to
say that "overcoming the presumption of 'prima facie impropriety' [was] not easily
accomplished." *Id.* It's significant (and worth repeating) that *Flatt* is both more recent and
from a higher court than *Klemm*. SCIF has never adequately addressed how its read of *Klemm*
comports with the *Flatt* ruling. *Flatt* brings SCIF's reading of *Klemm* into question.

Okay, but what if waiver was available here under *Klemm*, and SCIF's concurrent
representation wasn't barred by *Flatt*? The conflict was still unwaivable under the court's own
inherent authority "to control in furtherance of justice, the conduct of its ministerial
officers." *City & Cty. of San Francisco*, 38 Cal. 4th at 846 (alteration and internal quotation
marks omitted) (quoting *SpeeDee Oil*, 20 Cal. 4th at 1139); *see* Cal. Civ. P. Code § 128."The
paramount concern must be to preserve public trust in the scrupulous administration of
justice and the integrity of the bar." *SpeeDee Oil*, 20 Cal. 4th at 1145. Even with the clients'
informed consent, courts shouldn't allow concurrent representation "when the public
interest [is] involved or where the likelihood of prejudice to one party is extremely great."
*Unified Sewerage Agency*, 646 F.2d at 1347 (interpreting the old ABA Code of Professional
Responsibility).

The Court was confronted with just such a situation here. Hueston Hennigan's
concurrent representation of Randall and SCIF threatened the parties' and public's interest in
obtaining a just process in ways that even informed, written consent couldn't fix. The
previous review of the conflict and its problems—including its impact on the parties—was

extensive in part to provide some of the many examples of this threat. In the complexity of this litigation, problems could arise and greatly harm a party before the problem was even recognized. And managing the problems adds to the complexity of this litigation whose complexity is a challenge even without conflicts constantly lurking.

There's also the Court's own, independent need for adversarial advocates. The combative nature of our legal system is an integral part of the fight for truth and justice. Courts rely on attorneys to probe and attack their opponents' positions. This process helps courts. It can help parties too. Good lawyers anticipate their opponent's moves, jabs, and counters, and create appropriate offensive and defensive strategies of their own. But when an attorney represents both sides of a dispute, there's really just one fighter in the ring shadowboxing. That lack of real opposition provides the lawyer perverse incentives to act in ways contrary to our nation's notions of fairness and due process. Does the lawyer hold his punches? How can a court know? Without a robust adversary, one side might drop its gloves and put in a sloppy effort, knowing that weaknesses in its own position aren't going to be exploited. Our system can't function this way.

And of course, even if an attorney conflicted in the way that Hueston Hennigan was here could get informed waivers from its adverse clients, and even if the attorney could concurrently represent those clients' adverse interests, and even if the Court could trust the attorney's representations that it was doing so, there would still be the issue of public perception. Lawyers often appropriately delve into the details of the law. What's the applicable legal standard? Who bears the burden? What's the appropriate jurisdiction? The law is full of technical, hard questions. But lawyers also often need to step back for a moment and ask the person-on-the-street question: if you gave non-lawyers the facts in front of you and asked their opinion, what would their reaction be? That question isn't part of any

formal legal analysis, but its answer can help illuminate how the public's interests are impacted by a legal issue. It also often leads to the right legal solution—the law generally (though not always) skews towards our society's commonsense notions of fair play and justice. The answer is relevant to the public's perception of the legal system.

Here, it appears no one at SCIF thought much about the person-on-the-street question or its answer. The question was posed at the beginning of this opinion: can a lawyer represent—at the same time, in the same litigation, in the same courthouse—a criminal and his victim? It's hard to imagine many people saying that this is okay. The Court has an obligation, independent of all of the other legal authority discussed here, "to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *SpeeDee Oil*, 20 Cal. 4th at 1145.

Finally, there are the California Rules of Professional Responsibility. They too generally bar an attorney from representing clients with adverse interests, although there's an exception the Court will discuss in the section immediately following. *See* Cal. R. of Prof'l Conduct 3-310(C).

For all these reasons, consistent with *Klemm*, following *Flatt*, under the Court's inherent authority, and in line with the California Rules of Professional Responsibility, Hueston Hennigan's conflict was unwaivable.

### 3.2.4 The Waivers

Nonetheless, Hueston Hennigan thought it had found a loophole. While California's Rules of Professional Conduct generally support the unwaivability of the conflict, they do

32

allow concurrent representation of clients with adverse interests in limited situations if both clients provided informed, written consent. *See* Cal. R. of Prof'l Conduct 3-310(C). It's worth noting that this rule doesn't overcome all of the other reasons this conflict was unwaivable, and even this rule recognizes that "[t]here are some matters in which the conflicts are such that written consent may not suffice." Cal. R. of Prof'l Conduct 3-310 cmt.

But what if Hueston Hennigan had found a loophole big enough to fit this conflict through? What if this was somehow within the ambit of the limited exceptions provided under California Rule of Professional Responsibility 3-310(C)? Did Hueston Hennigan get informed written consent from Randall and SCIF? No.

Determining whether a client provided adequate informed, written waiver is "is obviously a fact-specific inquiry." *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1106 (N.D. Cal. 2003) (internal quotation marks omitted) (quoting Cal. Ethics Op. 1989–115 at IIA–315). Among other things, courts consider

> the breadth of the waiver, the temporal scope of the waiver (whether it waived a current conflict or whether it was intended to waive all conflicts in the future), the quality of the conflicts discussion between the attorney and the client, the specificity of the waiver, the nature of the actual conflict (whether the attorney sought to represent both clients in the same dispute or in unrelated disputes), the sophistication of the client, and the interests of justice.

*Id.*

Hueston Hennigan sent waivers to Randall and SCIF where the clients purportedly

33

provided informed consent to the conflicted representation. But there are many things about the waivers that caused the Court to question their authenticity, accuracy, efficacy, and reliability.

Let's start with the timeline.

- Tantuwaya filed the motion to disqualify on February 20, 2016, and set the matter for hearing on March 21, 2016. Before this, Tantuwaya had met and conferred with SCIF through its counsel at Hueston Hennigan. Hueston Hennigan didn't mention that it had gotten waivers from either Randall or SCIF.

- SCIF filed its opposition on February 29, 2016. In it, SCIF said there were four relevant waivers from SCIF and three from Randall. But SCIF only provided the most recent SCIF waiver, from February 2016.

- Tantuwaya filed a reply on March 7, 2016, pointing out that SCIF had only included one waiver.

- Tantuwaya filed a sur-reply on March 12, 2016, following Randall's deposition. According to Tantuwaya, Randall testified that: (1) he only signed two waivers—one with Irell & Manella and one with Hueston Hennigan—not three; (2) Hennigan told Randall that by signing the conflict waiver, he would not give up anything or lose any rights, and Randall did not have the matter reviewed by independent counsel; (3) Randall wasn't offered the waiver signed by SCIF; (4) Randall doesn't recall being advised of the potential consequences presented by the simultaneous representation by Irell & Manella or Hueston Hennigan of him and SCIF; and (5) Randall's representation by Irell & Manella began

34

in 2010.

- SCIF filed a sur-sur-reply on March 14, 2016. SCIF included a declaration from Randall stating he had actually signed three waivers after all, that he had retained Hennigan to represent him starting in June 2011, not 2010, and that Hennigan had explained the potential consequences of the conflict with him. SCIF included the three waivers with Randall's declaration. Finally, Randall declared that he had consulted with an attorney named Jerry Sparks about the waiver.

- Sparks filed a declaration on March 15, 2016. In the declaration, Sparks said—under penalty of perjury—that he never had a conversation about the waiver with Randall.

- The Court held the hearing on the motion to disqualify on March 21, 2016. As of this date, the Court still had only four of the seven purported waivers. None of the witnesses who could support the legitimacy of the waivers were made available at the hearing. Nor did SCIF present any other evidence about the waivers.

- The Court issued its order disqualifying Hueston Hennigan on March 22, 2016.

- SCIF filed the Motion for Reconsideration on April 18, 2016. SCIF included a declaration from its assistant chief counsel, and the three remaining waivers. Of these waivers, two were heavily redacted versions.

- The Court held the hearing on the Motion for Reconsideration on May 9, 2016. The Court ordered SCIF to lodge unredacted versions of the two redacted waivers for the Court's review. SCIF did so.

So many aspects of this timeline were and are troubling. Why didn't SCIF mention

the waivers at the initial meet-and-confer, instead of focusing on saber-rattling sanctions threats? Who was right and who was wrong when Randall and SCIF made contradictory representations about the number of waivers and what Randall was told about those waivers? Why did Randall later recant his sworn testimony? What does it say about Randall's purportedly informed consent that he apparently couldn't remember basic details about giving that consent? Why did SCIF wait so long to submit the waivers to the Court, even after SCIF's opponents and the Court expressed concern about those waivers? More specifically, why did it take nearly three months from the time Tantuwaya filed the motion to disqualify for SCIF to grudgingly file all the waivers (or at least all the ones SCIF promised—as discussed later, there might be more relevant material), and then take more nudging by the Court to get SCIF to lodge unredacted versions for the Court to review?

And above all else, who committed perjury? Randall submitted a declaration, signed under penalty of perjury, saying that he'd discussed the concurrent representation conflict with Sparks. The very next day, Sparks submitted a declaration, signed under penalty of perjury, saying that he'd had no such conversation with Randall. At best, this conversation was a debacle of a discussion, where one person left thinking something wasn't discussed at all, and the other person left thinking something was discussed thoroughly. That best-case scenario can't support a finding that Randall gave informed consent to waiving the conflict. And there's the worst case (and more likely) scenario: someone lied to the Court.

That leads to yet another issue.

If Sparks were truly independent counsel, qualified to advise Randall about the conflict in this case, the Court might have more readily believed him over Randall given their conflicting statements. After all, truly independent counsel would likely have little incentive

1   to lie. On the other hand, Randall might have been facing pressure to make things

2   okay—maybe he liked his lawyer a lot, or maybe he owed his lawyer money, or maybe he just

3   couldn't afford the potential consequences of a disqualification order here on his wallet and

4   his criminal case.

5

6           But here, Sparks presented conflict questions of his own. Of course, he was a central

7   figure in the first disqualification motion in this case. But more relevant here, and in another

8   incestuous twist, Sparks is counsel of record for Drobot Jr. and several other defendants in

9   this case, including Industrial Pharmacy Management LLC, Coastal Express Pharmacy Inc.,

10  Long Beach Prescription Pharmacy, and Meds Management Group LLC. It's hard to say that

11  Sparks qualifies as "independent counsel" who could have provided Randall with meaningful

12  informed consent. *See Visa*, 241 F. Supp. at 1106 (courts should consider the quality of the

13  conflicts discussion between the attorney and the client in determining the sufficiency of a

14  waiver).

15

16          What's even worse is that Hueston Hennigan knew about this conflict-within-a-

17  conflict.

18

19          On one hand, the firm knew that Randall's supposedly "independent" counsel was

20  Sparks. Hypothetically, Randall could have consulted with Sparks and later told Hueston

21  Hennigan he'd met with independent counsel, without specifying to Hueston Hennigan who

22  that counsel was. The firm could then have credibly claimed ignorance of Randall's

23  dubiously-independent independent counsel. But that's not what actually happened.

24  Hennigan first asked Randall for a conflicts waiver on June 19, 2013, and advised Randall to

25  get the advice of independent counsel. Randall says he consulted with Sparks and then orally

26  told Hennigan that the conflict was acceptable, all within the next day. Hennigan

27

28                                              37

memorialized all this in a letter he sent to Randall on July 12, 2013. Hennigan's letter
explicitly acknowledges Sparks by name as the attorney Randall consulted with.

On the other hand, the firm knew Sparks represented other parties in the case. Just a
few days before Hennigan sent his July 12 letter to Randall, Hueston Hennigan had served
the summons, complaint, and related documents in SCIF 1 on Sparks as counsel for all the
defendants he represents. At the time, Sparks was just one of a few attorneys on the docket
in SCIF 1, so it's not as if his name got lost in the shuffle and Hueston Hennigan just didn't
make the connection.

Even though Hueston Hennigan knew that Randall's supposedly "informed" consent
was based on advice from so-called "independent counsel" that was anything but
independent, the firm still argued that Randall provided informed consent sufficient to justify
Hueston Hennigan's infidelity. Figuratively speaking, Hueston Hennigan told Randall to talk
to independent counsel about the SCIF-Randall conflict, watched him walk to the other side
of the courtroom to consult with opposing counsel about the conflict, accepted Randall's
waiver, and now argue that Randall had informed consent by independent counsel. Even if
Sparks did advise Randall precisely as SCIF says he did, Randall's waiver wasn't informed by
independent counsel. That wasn't by itself enough to sustain disqualification here, but it sure
hurt SCIF's arguments that Randall had informed consent.

The recency of Randall's last waiver versus SCIF's last waiver was also troubling.
Before Tantuwaya filed his motion for disqualification, SCIF's most recent waiver was from
December 2015. Randall's was from about eight months earlier, in April 2015. Since
Randall's last waiver, there have been about 600 docket entries in SCIF 1 alone. Yet Hueston
Hennigan only felt that it was necessary to readvise and get another conflicts waiver from

38

SCIF after the motion for disqualification got filed, and not Randall. There are innocent explanations imaginable for this discrepancy in treatment—perhaps, for example, the attorney managing the relationship with SCIF was more proactive than the one managing the relationship with Randall. But the most obvious explanation is that Hueston Hennigan just cared more about making sure its (financially) heavyweight client was okay with everything than it cared about making sure its featherweight client was okay with everything. Of course, this sort of preferential treatment was one of the primary concerns the Court has here.

These are all problems that existed without even getting into the actual substance of the waivers. The previous review of the conflict and its manifestations in this litigation was extensive in part to show the sorts of issues considered when evaluating whether the content of the waivers supports the existence of informed consent. But that lengthy discussion didn't even capture all of the problems with the text of the waivers.

It's helpful to start by stepping back and looking at the all of the relevant language from each waiver, starting chronologically with Randall's three and then moving chronologically through SCIF's four. It's a lot to read, but getting into the exact language is important to understanding the Court's conclusions about the waivers' inefficacy.

Randall's first waiver came in his June 20, 2011, engagement letter with Irell & Manella. Here's the relevant language regarding conflicts.

The Firm represents many other entities and individuals. It is possible that, during the course of our engagement, an existing or future client may seek to hire the Firm in connection with an actual or potential transaction or pending or potential

39

litigation or other dispute resolution proceeding in which such other client's interests are or potentially may become adverse to the Client's interests.

Because the duty of loyalty would otherwise prevent the Firm from being adverse to a current client, the California Rules of Professional Conduct prevent the Firm from accepting such engagements during the Firm's representation of the Client absent informed written consent by the Client and the waiver of the duty of loyalty. The Client hereby waives the duty of loyalty insofar as it would be applicable and agrees that, even while the Firm is representing the Client, and at all times thereafter, the Firm may represent existing or new clients in any matter that is not substantially related to our work for the Client, even if the interests of such clients are directly adverse to the Client (whether or not the Client is then represented by the Firm), or any of its affiliates, including litigation in which the Client or any of its affiliates are parties. This waiver shall also allow the Firm to examine or cross-examine the Client (and the Client's employees and agents) on behalf of existing or new clients in other proceedings (including but not limited to proceedings to which the Client is not a party) provided the other matter is not substantially related to our representation of the Client. Notwithstanding this consent and waiver, the Firm shall hold confidential all information provided to it by the Client in the course of the Firm's engagement on behalf of the Client, and will not use such information for any purpose except for the benefit of, and on behalf of, the Client.

The Client recognizes the potential adverse consequences that may result from the Firm's representing parties that are adverse to the Client. These include the

perception, which may undermine the Client's trust in the Firm, that the Firm's loyalty and independence of judgment with respect to the Client are impaired. . . . The Firm encourages the Client to have this waiver reviewed by independent counsel acting on the Client's behalf before executing this waiver.

Randall's second waiver seems to have come around the time Irell & Manella was looking to begin representing SCIF. The waiver is dated July 12, 2013. Here's the relevant language regarding conflicts, with all alterations in the original.

Irell & Manella LLP (the "Firm" or "us") has previously represented you ("you" or the "Client") in connection with a federal investigation. In the prior engagement letter (dated June 16, 2011), you agree to waive any conflict of interest if the Firm represented "existing or new clients in any matter that is not substantially related to our work for [you], even if the interests of such clients are directly adverse to [you] (whether or not [you are] represented by the Firm), or any of its affiliates, including litigation in which [you] or any of [your] affiliates are parties."

The Firm has been asked to represent another client (an insurer) in an investigation and possible civil lawsuit to recover damages for suspected insurance fraud (the "Other Matter"). The Other Matter would likely involve claims that various entities and individuals involved in the provision of medical services defrauded the insurer. Although we presently have no reason to believe that you would be named as a defendant by the insurer in the Other Matter, it is possible that you may be a material witness in the Other Matter. If we file a lawsuit on behalf of the insurer in the Other Matter, then you may be called upon

41

to give testimony, at deposition and at trial, and in these proceedings the Firm would represent the insurer and its interests in seeking information from you and in examining you as a witness. Consistent with the conflict waivers contained in our engagement letter with you dated June 16, 2011, you agree that the Firm may represent the insurer in the Other Matter, and that the Firm may cross-examine you in the Other Matter, even though the Firm's actions in such regard may be adverse to your interests.

The waiver also included the same last paragraph about potential adverse consequences and independent counsel as the last waiver.

Randall said he signed an updated conflict waiver in February 2015 when Hennigan left Irell & Manella to form Hueston Hennigan, but it appears SCIF didn't provide this waiver to the Court. Randall's final (and for the purposes of this opinion, third) waiver came in April 2015 (although Randall's declaration mistakenly dates the waiver to April 2016). Here's the body of the waiver.

Dear Paul:

As you are aware, several attorneys at my law firm, Hueston Hennigan LLP, represent the plaintiff, State Compensation Insurance Fund ("State Fund"), in its lawsuit filed against Michael Drobot, Sr., Michael Drobot Jr., Pacific Hospital of Long Beach, California Pharmacy Management, Industrial Pharmacy Management, and several other entities pending in United States District Court, Central District of California, Case No. 8:13-cv-00956-AG-CW (the "State Fund Litigation"). You and I have previously discussed the potential for conflicts in

connection with my representation of you in the federal investigation and other attorneys at my firm's representation of State Fund in the State Fund Litigation. You have also signed conflicts waivers that disclosed these potential conflicts, including most recently in February 2015. Enclosed for your reference is another copy of the February 2015 conflicts letter and executed waiver.

The purpose of this letter is to make further written disclosure to you regarding recent developments in the State Fund Litigation about which you may or may not already be aware. On March 23, 2015, certain defendants in the State Fund Litigation (the "Surgical Defendants") filed a Third-Party Complaint against you and more than 30 others for equitable indemnity and declaratory relief. This development makes it more likely that State Fund, through an amended complaint, will now attempt to assert claims against all third-party defendants, including you. I do not know for certain that State Fund will name you as a defendant, but given the Surgical Defendants' Third-Party Complaint, this should now be considered a possibility. Being named as a third-party defendant, and potentially a defendant in the State Fund Litigation, is of course adverse to your interests, because if you are found liable, a judgment for damages and/or other forms of relief may be entered against you.

As attorneys, we are governed by specific rules relating to our representation of clients when actual or potential conflicts of interest exist. Rule 3-310(C) of the California Rules of Professional Conduct states that an attorney may only accept or continue representation of clients whose interests actually or potentially conflict if each client gives informed written consent to the representation. While you have previously provided your informed written consent of my

representation of you in the federal investigation matter in light of the fact that other attorneys at my firm represent the State Compensation Insurance Fund in the State Fund Litigation, this recent turn of events alters, or at least has the potential to alter, the nature of any conflict such that we have concluded that further disclosure and consent was advisable.

For example, since you are now a third-party defendant in the State Fund Litigation, and may potentially be named as a defendant by State Fund, I will not be able to represent you in the State Fund Litigation. If State Fund names you as a defendant, it will likely take action that is adverse to your interests, including, as previously discussed, cross-examining you, and seeking damages or other forms of relief against you in connection with the State Fund Litigation. In addition, and as discussed in the context of the February 2015 meeting, any non-privileged information that you voluntarily disclosed to the attorneys representing State Fund could be used by State Fund in the course of pursuing its claims against the Surgical Defendants and now, potentially, against you.

I encourage you to consult with other counsel, unrelated to my firm or to my prior firm, Irell & Manella, in connection with this waiver of conflict of interest. I also strongly encourage you to share this letter with any counsel you have retained or will retain to represent you in the State Fund Litigation.

Upon consideration of the foregoing disclosures in this letter and the previous conflict waivers that you signed regarding actual or potential conflicts posed by the State Fund Litigation, if you decide that you would like me to continue to represent you in the federal investigation, then please sign and date this letter

below and return the letter to me for my files. Your signature below will acknowledge that you have received disclosure of the above information, that you have been advised of your right to seek the advice of independent counsel, that you have had a reasonable opportunity to seek independent counsel, and that you agree to my continued representation of you in light of what has been disclosed above.

Should you have any questions concerning the disclosure of conflicts in this letter, please feel free to contact me immediately. As stated above, I would also encourage you to discuss them with your own separate counsel before signing and returning this letter.

Very truly yours,

Brian Hennigan

Next, SCIF's waivers. Irell & Manella apparently addressed conflicts generally in its engagement letter with SCIF, although the Court couldn't determine that for sure since SCIF didn't provide that letter to the Court. It looks like Irell & Manella first specifically addressed the Randall-SCIF conflict in a waiver signed on June 20, 2013, by SCIF's Assistant Chief Counsel. Here's the body of the waiver.

Dear Carol:

We are pleased that you have engaged Irell & Manella LLP (the "Firm") to represent State Compensation Insurance Fund (the "Client").

In representing the Client with regard to a potential matter involving Pacific Hospital of Long Beach ("Pacific Hospital"), we have investigated a number of sources and recently determined that one of our partners represents an individual (Paul Randall) connected with entities related to Pacific Hospital and a related federal investigation. Given present circumstances, the representation does not appear to be adverse and may be complementary. However, interests may diverge, and out of an abundance of caution, we wished to confirm that the engagement letter and conflict waiver the Client previously executed applies to the particular matter here with regard to Mr. Randall and the matter involving Pacific Hospital. Accordingly, we repeat the relevant paragraphs from our initial engagement letter below, and request that you sign and return this letter to us.

Because the duty of loyalty would otherwise prevent the Firm from being adverse to a current client, the California Rules of Professional Conduct prevent the Firm from accepting such engagements during the Firm's representation of the Client absent informed written consent by the Client and the waiver of the duty of loyalty. The Client hereby waives the duty of loyalty insofar as it would be applicable and agrees that, even while the Firm is representing the Client, and at all times thereafter, the Firm may represent existing or new clients in any matter that is not substantially related to our work for the Client, even if the interests of such clients are directly adverse to the Client (whether or not the Client is then represented by the Firm), or any of its affiliates, including litigation in which the Client or any of its affiliates are parties. This waiver shall also allow the Firm to examine or cross-examine the Client (and the Client's employees and agents) on behalf of existing or new clients in other proceedings (including but not limited to proceedings to which the Client is not a party) provided the other matter is not

substantially related to our representation of the Client. Notwithstanding this consent and waiver, the Firm shall hold confidential all information provided to it by the Client in the course of the Firm's engagement on behalf of the Client, and will not use such information for any purpose except for the benefit of, and on behalf of, the Client.

The Client recognizes the potential adverse consequences that may result from the Firm's representing parties that are adverse to the Client. These include the perception, which may undermine the Client's trust in the Firm, that the Firm's loyalty and independence of judgment with respect to the Client are impaired. The Firm's representation of parties adverse to the Client may come at a time when it would harm the Client's interests to terminate the services of the Firm, or after expenditures of fees and costs to the Firm that might need to be replicated by new counsel. The Firm encourages the Client to have this waiver reviewed by independent counsel acting on the Client's behalf before executing this engagement agreement.

Your signature below will confirm that you have been made aware of these potential conflicts of interest, and—after having the opportunity to consult with independent counsel of your choosing—you have agreed to waive any such conflict.

We appreciate the confidence you have placed in us.

Very truly yours,

47

John C. Hueston

for IRELL & MANELLA LLP


After Hueston, Hennigan, and the other former-Irell & Manella lawyers started Hueston Hennigan, the new firm provided SCIF with a new engagement letter on January 9, 2015. Curiously, that letter apparently didn't address the Randall-SCIF conflict, even though the Hueston Hennigan lawyers obviously knew about the conflict given their representation of both Randall and SCIF at Irell & Manella.


SCIF's second waiver is dated April 24, 2015. SCIF filed a heavily redacted version of the waiver on the public docket. Here's the relevant unredacted language regarding conflicts.


Hueston Hennigan LLP (the "Firm") currently represents State Compensation Insurance Fund ("State Fund" or "Client") in the above-referenced matter entitled *State Compensation Insurance Fund v. Michael D. Drobot, Sr., et al.* (the "Litigation") pursuant to the terms set forth in the Engagement Letter dated January 9, 2015 and the Standard Terms of Retention attached thereto. The Surgical Defendants in the Litigation recently filed a third-party complaint for indemnification and declaratory relief against certain medical providers and marketers. The Client has decided to assert direct claims against these third-party defendants and others (the "New Parties" or, individually, "New Party") in a Third Amended Complaint.


As disclosed to the Client at the outset of this Litigation, Irell & Manella LLP represented Mr. Paul Randall in an unrelated criminal matter. At that time, the Client signed a conflict waiver with respect to Mr. Randall, understanding that he

48

may be a material witness in the Litigation. Mr. Randall has since been named a third-party defendant in the Litigation. State Fund may elect to assert direct claims against Mr. Randall in the Third Amended Complaint. While Mr. Randall has not signed a new Engagement Letter with Hueston Hennigan LLP, the attorney who represented Mr. Randall at Irell & Manella LLP, Brian Hennigan, is currently employed by Hueston Hennigan LLP. Mr. Hennigan may be required to provide additional legal services to Mr. Randall in the future in connection with that same criminal matter. The Client hereby waives the conflict of interest insofar as it would be applicable and agrees that, even while the Firm is representing the Client and potentially pursuing claims against Mr. Randall in this Litigation, and at all times thereafter, the Firm may represent Mr. Randall in any matter that is not substantially related to our work for the Client (including in the criminal matter that predated this Litigation), even if the interests of Mr. Randall are directly adverse to the Client (whether or not the Client is then represented by the Firm). Notwithstanding this consent and waiver, the Firm shall hold confidential all information provided to it by the Client in the course of the Firm's engagement on behalf of the Client, and will not use such information for any purpose except for the benefit of, and on behalf of, the Client. The Firm encourages the Client to have this waiver reviewed by independent counsel acting on the Client's behalf before executing this Engagement Letter.

SCIF's third waiver is dated December 17, 2015. Again, SCIF filed a heavily redacted version of the waiver on the public docket. Here's the relevant unredacted language regarding conflicts. It's mostly identical to the language in the second SCIF waiver.

The purpose of this letter is to memorialize the April 24, 2015 [REDACTED] Engagement Letter's application to the Capen Litigation.

As disclosed to the Client at the outset of this Litigation, Irell & Manella LLP represented Mr. Paul Randall in an unrelated criminal matter. At that time, the Client signed a conflict waiver with respect to Mr. Randall, understanding that he may be a material witness in the Capen Litigation. Mr. Randall has since been named a third-party defendant in the Drobot Litigation. State Fund did not assert direct claims against Mr. Randall in the Third Amended Complaint. The attorney who represented Mr. Randall at Irell & Manella LLP, Brian Hennigan, is currently employed by Hueston Hennigan LLP. Mr. Hennigan may be required to provide additional legal services to Mr. Randall in the future in connection with that same criminal matter. The Client hereby waives the conflict of interest insofar as it would be applicable and agrees that, even while the Firm is representing the Client and potentially pursuing claims against Mr. Randall in the Drobot or Capen Litigation, and at all times thereafter, the Firm may represent Mr. Randall in any matter that is not substantially related to our work for the Client (including in the criminal matter that predated this Litigation), even if the interests of Mr. Randall are directly adverse to the Client (whether or not the Client is then represented by the Firm). Notwithstanding this consent and waiver, the Firm shall hold confidential all information provided to it by the Client in the course of the Firm's engagement on behalf of the Client, and will not use such information for any purpose except for the benefit of, and on behalf of, the Client. The Firm encourages the Client to have this waiver reviewed by independent counsel acting on the Client's behalf before executing this Engagement Letter.

SCIF's final waiver came after Tantuwaya filed the motion for disqualification. It looks like Hueston Hennigan got it so that they could include it with SCIF's opposition to the motion—the waiver is dated February 25, 2016, and SCIF filed its opposition on February 29, 2016. Here's the entire body of the waiver.

Dear Margie:

Hueston Hennigan LLP (the "Firm") currently represents State Compensation Insurance Fund ("State Fund") in the actions entitled *State Compensation Insurance Fund v. Michael D. Drobot Sr., et al.*, United States District Court, Central District of California, Case No. 8:13-cv-00956-AG (CWx) (the "Drobot Action"), and *State Compensation Insurance Fund v. Daniel Capen*, United States District Court, Central District of California, Case No. 8:15-cv-01279 AG (JCGx) (the "Capen Action," and collectively with the Drobot Action, the "Actions").

As you are aware, my partner, Brian Hennigan, represents Paul Randall, a health care marketer previously affiliated with Tri-City Regional Medical Center in Hawaiian Gardens ("Tri-City") and Pacific Hospital of Long Beach ("Pacific Hospital"), who pleaded guilty on April 16, 2012 to conspiracy to commit mail fraud. A copy of the plea agreement was sent to State Fund when it was unsealed. According to his plea agreement, Randall conspired with Tri-City hospital executives to pay kickbacks to doctors and chiropractors to refer workers' compensation patients to Tri-City for spinal surgeries. His plea agreement states that the surgeries at Tri-City involved use of spinal surgery hardware that Randall distributed to Tri-City at inflated prices through his company Summit Medical Group, knowing that the cost would be passed on to insurers. It further states

51

that using proceeds from the sale of the hardware, Randall paid a 5% kickback to Tri-City and kickbacks of up to $20,000 per surgery to the doctors and chiropractors who referred the patients. It further states that through a separate company, Platinum Medical, Randall paid kickbacks to doctors in return for referrals of patients for toxicology tests. The Department of Justice has asserted that Randall also facilitated a similar scheme at Pacific Hospital by introducing doctors to Drobot and coordinating kickback arrangements and that the criminal investigation is continuing with respect to Pacific Hospital and potentially other facilities. We understand that Randall is scheduled to be sentenced in the Tri-City matter on April 8, 2016. The Firm's representation of Randall is limited to the criminal matter, *U.S. v. Randall*, SA CR 12-23 (the "Criminal Matter").

As you also know, Randall has been named as a third-party defendant in the Drobot Action. Even before Randall was named as a third-party defendant, and as we have discussed with State Fund on multiple occasions, Randall is expected be a material witness in the Actions, and he also has potential exposure directly to State Fund. Although State Fund decided not to assert direct claims against Randall in the Actions, State Fund could still pursue such claims in a separate action, and we continue to believe that Randall will be a material witness in the Actions in any event. Of course, in light of State Fund's potential claims against Randall and Randall's alleged role as a co-conspirator in the Pacific Hospital scheme at issue in the Actions, State Fund and Randall may have, and likely do have, directly adverse interests.

As attorneys, we are governed by specific rules relating to our representation of clients when actual or potential conflicts of interest exist. Rule 3-310(C) of the

California Rules of Professional Conduct states that an attorney may only accept or continue representation of clients whose interests actual or potentially conflict if each client gives informed written consent to the representation. State Fund has previously provided its informed written consent of the Firm's concurrent representation of State Fund in the Actions and of Randall in the Criminal Matter. However, because one of the defendants in the Drobot Matter, Lokesh Tantuwaya, M.D., recently filed a motion to disqualify the Firm based on the actual or potential conflicts of interests that arise from that concurrent representation (the "Disqualification Motion"), we want to remind you of the risks and possible adverse effects of that concurrent representation and ensure that State Fund has made a fully informed decision to have the Firm continue to represent it in the Actions. For example, concurrent representations give rise to a risk that the Firm may favor the interests of one client over the other, that the Firm's exercise of independent judgment to one client may be impaired by its relationship with the other client, that the Firm may not be able to present the appropriate positions, claims, or defenses for one client in order to avoid taking positions adverse to the other client, that the Firm may be restricted from forcefully advocating one client's position for fear of losing the confidence of the other client, that the Firm may be required to limit its representation and not be able to give each client complete legal advice as a result of its obligation to the other client, and that there may be an appearance of impropriety in the representation of both clients simultaneously. We urge you to also carefully review the Disqualification Motion, which discusses some of these and potentially other risks associated with the concurrent representation of clients with adverse interests.

Upon consideration of the foregoing disclosures and the previous conflict waivers that State Fund has signed regarding actual or potential conflicts of interest posed by the Firm's concurrent representation of Randall in the Criminal Matter, if State Fund decides that it would like the Firm to continue to represent State Fund in the Actions, then please sign and date this letter below and return the letter to me for my files. Your signature below will acknowledge that State Fund has received disclosure of the above information, that State Fund has been advised of its right to seek the advice of independent counsel with respect to the advisability of signing this conflict waiver, that State Fund has had a reasonable opportunity to seek such advice, and that State Fund waives all actual and potential conflicts in connection with the Firm's concurrent representation of State Fund and Randall and agrees to the Firm's continued representation of it in the Actions. In the event that circumstances change or we become aware of new information that requires a further consent, we will advise you of that fact immediately.

Please feel free to contact me should you have any questions concerning the disclosure of conflicts in this letter or the prior conflict waivers executed by State Fund, the Disqualification Motion, or any other matters.

These waivers were ineffective for many reasons—reasons that are reflected in the previous, extensive review of the conflict and its manifestations in this litigation. The Court discusses three more reasons the waivers didn't adequately reflect Randall's and SCIF's informed consent: (1) the waivers' "unrelated" language, (2) the waivers' lack of specificity, and (3) the waivers' suspect terms. There were more issues with the waivers that arose out of redacted portions of SCIF's waivers. SCIF seems to have overredacted these documents, particularly since much of the redacted information may not be privileged. *See United States v.*

54

1    *Blackman*, 72 F.3d 1418, 1424 (9th Cir. 1995). But out of an abundance of caution and given

2    the myriad of other reasons the waivers were inadequate, the Court will not get into those

3    issues possibly involving privilege here.

4

5            First, unrelatedness.

6

7            Five of the seven waivers provided that Hueston Hennigan could represent the other

8    client—Randall, for SCIF's waivers, or SCIF, for Randall's waivers—in *unrelated* cases. In his

9    first waiver, Randall agreed that Hueston Hennigan "may represent existing or new clients in

10   any matter that is not substantially related to" Hueston Hennigans' work for Randall.

11   Randall's second waiver incorporated identical language. SCIF's first waiver also used this

12   language, with SCIF agreeing that Hueston Hennigan "may represent existing or new clients

13   in any matter that is not substantially related to" Hueston Hennigans' work for SCIF. SCIF's

14   second waiver similarly stated that Hueston Hennigan represents Randall "in an unrelated

15   criminal matter." SCIF agreed to the same stock language again: Hueston Hennigan "may

16   represent [Randall] in any matter that is not substantially related to" Hueston Hennigan's

17   work for SCIF. SCIF's third waiver was identical to SCIF's second waiver in this regard: it

18   stated that Hueston Hennigan represents Randall "in an unrelated criminal matter" and that

19   SCIF agreed that Hueston Hennigan "may represent [Randall] in any matter that is not

20   substantially related to" Hueston Hennigan's work for SCIF. That's every waiver except

21   Randall's third waiver and SCIF's fourth waiver.

22

23           Hueston Hennigan argued that these five waivers allowed it to represent both Randall

24   and SCIF in this litigation. But "unrelated?" Really? It's hard to construct any reasonable

25   argument that the civil cases and the criminal cases are unrelated, by any measure of the

26   word. At best, Hueston Hennigan's representations to its clients on this point merit judicial

27

28                                                  55

concern. At worst, they could constitute some flavor of fraud. In either case, they emphasize how much Hueston Hennigan's clients—Randall in particular—needed someone to provide them advice at critical moments. "[T]he validity of any agreement negotiated without independent representation of each of the parties is vulnerable to easy attack as having been procured by misrepresentation, fraud and overreaching." *Klemm*, 75 Cal. App. 3d at 901.

Hueston Hennigan's ever-shifting characterization of the cases reflects poorly on both the firm and the quality of the waivers it got from Randall and SCIF. Hueston Hennigan couldn't seem to decide whether its representation of Randall and SCIF was unrelated—as it stated in five of the waivers—or possibly complementary and not adverse—as it stated in its first SCIF waiver—or whether "State Fund and Randall may have, and likely do have, directly adverse interests"—as it stated in its most recent SCIF waiver. And this isn't a case where there was a dramatic scene change mid-litigation that Hueston Hennigan could point to as justification for these inconsistent, and even contradictory, representations to its clients. These sorts of contradictory statements couldn't establish informed consent in this litigation. And returning to the unrelated issue, there was no reasonable argument that the three cases at issue here aren't related. Indeed, as the Court's already discussed, the three cases should, if anything, be treated as one litigation for the purpose of this conflict analysis.

Second, boilerplate.

SCIF consistently argued that the seven waivers all adequately described the implications of waiving the specific conflict at issue, but much—and in some cases most—of each waiver consisted of boilerplate platitudes about the potential impact of the conflict. For example, the first (and therefore likely most important) time SCIF's attorneys provided

56

written information about the conflict to Randall and SCIF, they copied and pasted this paragraph.

> The Client recognizes the potential adverse consequences that may result from the Firm's representing parties that are adverse to the Client. These include the perception, which may undermine the Client's trust in the Firm, that the Firm's loyalty and independence of judgment with respect to the Client are impaired. The Firm's representation of parties adverse to the Client may come at a time when it would harm the Client's interests to terminate the services of the Firm, or after expenditures of fees and costs to the Firm that might need to be replicated by new counsel. The Firm encourages the Client to have this waiver reviewed by independent counsel acting on the Client's behalf before executing this engagement agreement.

Other large portions of the waivers could have been dropped into virtually any waiver without modification. They didn't reflect any careful contemplation of the particular implications of the conflict here. For example, slightly tweaked versions of this language appeared more than once.

As attorneys, we are governed by specific rules relating to our representation of clients when actual or potential conflicts of interest exist. Rule 3-310(C) of the California Rules of Professional Conduct states that an attorney may only accept or continue representation of clients whose interests actually or potentially conflict if each client gives informed written consent to the representation. While you have previously provided your informed written consent of my representation of you in the federal investigation matter in light of the fact that

other attorneys at my firm represent the State Compensation Insurance Fund in the State Fund Litigation, this recent turn of events alters, or at least has the potential to alter, the nature of any conflict such that we have concluded that further disclosure and consent was advisable.

And, as noted, the relevant unredacted conflict language in SCIF's third waiver is virtually identical to the language in the second SCIF waiver. There's more like this.

Of course, boilerplate isn't by itself bad. Much of modern legal practice relies on the ability to repurpose successful work from the past when performing work in the present. But here the problem was that there wasn't much substantive meat surrounding the boilerplate bones of the waivers. The boilerplate bones didn't support much of anything on their own. When SCIF pointed to waivers full of this kind of language, the Court found it hard to characterize those waivers as reflecting or providing informed consent, particularly given the extensive difficulties already discussed.

What would have been enough? Tantuwaya's counsel identified a motion for disqualification that came before this Court in another case. There the government moved to disqualify a major law firm ("Law Firm") from representing a criminal defendant basically because of successive representation issues. *See* Order, *United States v. DeCinces*, SACR 12-0269-AG, Dkt. No. 441. This Court denied the motion. It noted that the criminal defendant had retained a former U.S. Attorney for the Central District of California—not an AUSA, but the U.S. Attorney—to serve as independent counsel that could advise him about waiver. The criminal defendant explained that he and his independent counsel had reviewed, among other things, the following conflicts and their associated risks.

- The Law Firm's potential conflicts relating to the Law Firm's alleged misstatements to the court and the impact on [the defendant's] representation;

- The Law Firm's potential conflicts relating to the potential for Law Firm counsel to testify at trial and the impact on [the defendant's] representation;

- The Law Firm's potential conflicts relating to any alleged desire to justify its prior actions or protect prior work product and the impact on [the defendant's] representation;

- The Law Firm's potential conflicts relating to any alleged financial interest in continuing to serve as [the defendant's] counsel and the impact on [the defendant's] representation;

- The Law Firm's potential conflicts relating to any alleged interest in avoiding any potential negative consequences as a result of its work on the current matter and the impact on [the defendant's] representation;

- The Law Firm's potential conflicts relating to any conflict between [the defendant's] testimony and the Law Firm's prior work product or counsel testimony and the impact on [the defendant's] representation;

- Potential conflicts relating to the Law Firm's past, current and future representation of [the other relevant parties] and any potential harm that could come to [the defendant] or any impact it might have on [the defendant's] representation; and

- Potential conflicts relating to the Law Firm's alleged concurrent and/or successive representation of [another party], including concerns relating to any additional particular arguments or claims that could be made against [the defendant].

*See* Decl., *United States v. DeCinces*, SACR 12-0269-AG, Dkt. No. 435-1 at 3:12–4:5. The criminal defendant and his retained independent counsel each filed a declaration under penalty of perjury that set forth many more details of their conversations. Their stories matched up with each other. This Court held that its decision to deny the motion to disqualify was "strengthened by [the criminal defendant's] waiver of conflict-free counsel, which is one of the best and most complete waivers the Court has ever seen." Order, *United States v. DeCinces*, SACR 12-0269-AG, Dkt. No. 441 at 8.

The Court didn't expect or require that gold standard of SCIF's counsel here, but the waiver in that case illuminated many of the inadequacies of the waivers in this case. *See Visa*, 241 F. Supp. 2d at 1106 (courts should consider the breadth of the waiver and the quality of the conflicts discussion between the attorney and the client in determining the sufficiency of a waiver). Tantuwaya pointed out many of the critical issues the Court already identified in this opinion but that the waivers here didn't address—issues that were particularly troubling with a criminal defendant whose liberty was and is at stake. These issues included

> (1) the competing positions of SCIF and Randall on the subject of restitution; (2) the competing interests of SCIF and Randall on discovering or disclosing Randall's assets; (3) the necessary disclosure by [Hueston Hennigan] to SCIF of information [Hueston Hennigan] learned in the course of Randall's criminal prosecution and cooperation; (4) the competing interest of the parties in having Randall testify or invoke his rights under the Fifth Amendment; (5) what [Hueston Hennigan] would do when Randall is called to testify, as he was at his deposition; [and] (6) what position [Hueston Hennigan] would take if the conflict was exposed and subject to disqualification.

The waivers here just didn't cut it.

Finally, enforceability. The waivers contained questionable terms. Here are two examples.

First, in Randall's first waiver he agreed to a blanket waiver of the duty of loyalty for any future conflicts that are "directly adverse." The Court doubts whether such a blanket waiver is either ethical or enforceable. *See Visa*, 241 F. Supp. 2d at 1106 (courts should consider the temporal scope of the waiver (whether it waived a current conflict or whether it was intended to waive all conflicts in the future) in determining the sufficiency of a waiver). At the very least, in the context of this case, Hueston Hennigan couldn't cash Randall's pre-conflict blank check for very much, given that Randall didn't (indeed, couldn't) know about the actual conflict at issue here.

Second and similarly, in Randall's second waiver, Hennigan specifically referenced Irell & Manella's representation of a client in "the Other Matter" involving "claims that various entities and individuals involved in the provision of medical services defrauded the insurer." Hennigan noted that Randall could be a material witness in "the Other Matter" and that Randall agreed to waive any conflict arising from that matter, including being cross-examined and deposed by Hueston Hennigan lawyers against Randall's interests.

The Court doubts whether a client can ever intelligently consent to being cross-examined (or deposed, as has already happened here) by the client's law firm in a way that would adversely affect the client's interests. Case law suggests that a lawyer cannot literally put a conflict of interest on the stand by cross-examining one client against her interests to

support another client's interests. *See Gilbert v. Nat'l Corp. for Hous. P'ship*, 71 Cal. App. 4th 1240, 1254 (1999) (finding an irreconcilable conflict of interest when a lawyer wanted to examine one client against his interests to support another client's interests). "The spectacle of an attorney skewering her own client on the witness stand in the interest of defending another client demeans the integrity of the legal profession and undermines confidence in the attorney-client relationship. *Hernandez v. Paicius*, 109 Cal. App. 4th 452, 467 (2003) (ordering a mistrial when an attorney violated the duty of loyalty by cross-examining one client to defend another client), *disapproved of on other grounds by People v. Freeman*, 47 Cal. 4th 993 (2010).

Setting aside Hennigan's failed attempt to limit the scope of his representation to Randall's "criminal" case, the following is undisputed: Hennigan represented a client with directly adverse interests to SCIF in this litigation. As noted, when a firm simultaneously represents two clients with an actual, present, existing conflict in the same litigation, "[a]s a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed." *Klemm*, 75 Cal. App. 3d at 898. Indeed, "common sense dictates that it would be unthinkable to permit an attorney to assume a position at a trial or hearing where he could not advocate the interests of one client without adversely injuring those of the other." *Id.* That's effectively what did and would have happened here had the Court not granted the motion for disqualification.

These reasons and others showed that the waivers couldn't support a finding of informed consent. What's more, the waivers themselves established the adversity of the concurrent representation, and also explained why it was improper for Hueston Hennigan to represent Randall and SCIF. Take the most recent waiver, SCIF's last one. It was the best waiver among the lot by several measures. It was the only one provided to the Court with SCIF's opposition to the motion for disqualification. More importantly, it was the most

honest and detailed in informing the client about the implications of the conflict. But by being forthright—and in that way more closely approaching a sufficient waiver than the others—the last waiver acknowledged many of the truths SCIF has otherwise been reluctant to admit. That last waiver explained why concurrent representation couldn't happen here.

> [C]oncurrent representations give rise to a risk that the Firm may favor the interests of one client over the other, that the Firm's exercise of independent judgment to one client may be impaired by its relationship with the other client, that the Firm may not be able to present the appropriate positions, claims, or defenses for one client in order to avoid taking positions adverse to the other client, that the Firm may be restricted from forcefully advocating one client's position for fear of losing the confidence of the other client, that the Firm may be required to limit its representation and not be able to give each client complete legal advice as a result of its obligation to the other client, and that there may be an appearance of impropriety in the representation of both clients simultaneously.

Yes! The Court has already explained why the waivers were ineffective. Through its content, this waiver reinforces why the conflict was unwaivable.

This last waiver also reinforces why the waivers' timing impacted their efficacy. In a concurrent representation case, the existence of multiple waivers isn't surprising, particularly when the specter of disqualification arises. Since the concurrently represented parties are both still clients, an attorney will simply get the existing clients to sign off on one waiver after another, each better than the last, until a court okays the waiver. But getting new waivers late in the game can mean that a client isn't really consenting voluntarily. For their part, clients may not want to spend time and money starting a long litigation over, or switching attorneys,

63

1   or incurring any of the other costs that come with getting a new lawyer. So they may stay

2   with a firm simply to minimize those transaction costs, and consent to a waiver they really

3   don't want. These concerns are less of an issue early in the representation. Thus a waiver

4   becomes more effective if the conflicted attorney raised the issue of the conflict at the

5   earliest time and provided clients with all appropriate details. Here, that happened in

6   reverse—Hueston Hennigan's best letter was its last one. That further reflects poorly on the

7   existence of informed consent.

8

9                    **3.2.5 Summing Things Up, Disqualification, and Hot Potatoes**

10

11          To sum up, Tantuwaya and the other moving Defendants had standing to bring the

12   motion for disqualification. Even if they didn't, the Court would have raised the

13   disqualification issue on its own. There was an actual, adverse, concurrent representation

14   conflict here. This conflict wasn't waivable. Even if it were, the waivers here weren't

15   adequate. That leads to the bottom line: disqualification of Hueston Hennigan was both

16   appropriate and necessary.

17

18          Could Hueston Hennigan have fixed this situation by simply dropping either SCIF or

19   Randall as a client?

20

21          No. The so-called "hot potato rule" provides that without a proper waiver, "a law

22   firm that knowingly undertakes adverse concurrent representation may not avoid

23   disqualification by withdrawing from the representation of the less favored client before

24   hearing." *Truck Ins. Exch. v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1057 (1992), *reh'g*

25   *denied and opinion modified* (June 10, 1992). As a practical matter, the rule prevents attorneys

26   from picking up all the clients they can and then dropping the less favorable ones as soon as

27

28                                                        64

conflicts appear. The rule also has a principle behind it that brings this discussion full circle. The duty of loyalty to an existing client is so important, so sacred, so inviolate that "not even by withdrawing from the relationship can an attorney evade it." *Flatt*, 9 Cal. 4th at 288.

The other frequently-offered solution in SCIF's papers is "conflict counsel." SCIF ended many of its arguments by saying, essentially, "even if there's a conflict on a particular point, we can pull in conflict counsel to independently represent our clients for that point." It seems that in SCIF's world view, conflict counsel could have become a cure-all for conflicts as they arose. But there were many problems with this.

First, what about the hot potato rule? Wouldn't SCIF basically have been dropping one of its clients whenever a conflict arose, at least for a few moments, in violation of the rule? This potential on-off-on-off-again representation was worse than the clean break with a conflicting client that's prohibited by the hot potato rule. As Tantuwaya's counsel cleverly pointed out, allowing this would have lead to something messier than a hot potato: mashed potatoes.

Second, and relatedly, how would this have worked practically?  Conflict counsel can't be reliably counted on because they won't know the history of the litigation as well as an attorney who has nurtured it for years. They also can't be reliably counted on to have the clairvoyance necessary to anticipate the twists and turns the litigation will take in the future. There are related details. For example, cross-examination often should provide the ingredients of a good closing argument. If conflict counsel needed to cross-examine Hueston Hennigan's client, would Hueston Hennigan—with closings in mind—have advised that counsel about how to approach the cross? If so, wouldn't the conflict counsel solution have failed? If not, wouldn't Hueston Hennigan have cheated its own client out of full

65

representation? Relatedly, who would have paid for this conflict counsel? Did the client have to pay for two (or more) sets of attorneys to prepare for matters in the litigation, in case a conflict comes up? Did the client have to pay for two (or more) sets of attorneys to be ready at a moment's notice at a deposition or trial, in case a conflict comes up? Did Hueston Hennigan have to pay? And returning to the duty to inform, if the conflict counsel got privileged information from Randall, would the conflict counsel need to share that with Hueston Hennigan? Did Hueston Hennigan then need to share that information with SCIF? The Court asked many of these questions during the hearings and in its orders. The Court is troubled that Hueston Hennigan never provided a satisfactory answer. What's more, there were many more problems like this that would complicate an already complicated case. For what?

### 3.2.6 Vicarious Disqualification

So disqualification of at least some of the attorneys at Hueston Hennigan was justified. But what about the others, particularly those who aren't directly conflicted off the case? Could they have continued as counsel?

No. "When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm." *SpeeDee Oil*, 20 Cal. 4th at 1139 (internal quotations omitted) (quoting *Flatt*, 9 Cal. 4th at 283). This is based on the rationale "that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." *City & Cty. of San Francisco, Inc.*, 38 Cal. 4th at 847–48 (quoting *SpeeDee Oil*, 20 Cal. 4th at 1153–54).

And not that it would have changed the Court's conclusion, but the Court notes that Hueston Hennigan never attempted to show compliance with an ethical screen or wall between the representations. As such, the knowledge of each attorney at Hueston Hennigan was automatically imputed to the others. SCIF didn't appear to argue otherwise. The entire law firm of Hueston Hennigan was disqualified from representing SCIF.

## 4.   THE MOTION FOR RECONSIDERATION

### 4.1   Legal Standard

Federal Rule of Civil Procedure 59 and Local Rule 7-18 provide the applicable standards for motions for reconsideration. "Under Rule 59(e), a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999). Similarly, Local Rule 7-18 provides that

> [a] motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

L.R. 7-18.

### 4.2    Analysis

The Local Rules of the Central District of California and case law each provide requirements for motions for reconsideration. SCIF needs to satisfy both sources of law to successfully move for reconsideration. But SCIF hasn't satisfied the requirements of either. Thus, there are multiple, independent reasons why the Court must decline to reconsider its earlier decision to disqualify. Tantuwaya also argues that reconsideration is inappropriate because SCIF failed to adequately meet-and-confer with defendants before it filed the motion, as it was required to do under Local Rule 7-3. The Court declines to address this argument, other than to note that it might provide yet another basis for declining reconsideration. And even if the Court reconsidered its earlier decision and considered SCIF's repackaged arguments, it would still find disqualification appropriate.

### 4.2.1 Evidentiary Issues

But before getting to the substantive arguments, the Court must address evidentiary issues both sides brought up.

First, Tantuwaya's objections. SCIF included declarations from Professor Laurie L. Levenson, Dean Erwin Chemerinsky, and Ellen Pansky to support its Motion for Reconsideration. Tantuwaya has specific objections to portions of each of these declarations. Tantuwaya also has three general objections. SCIF filed responses to these objections.

68

Tantuwaya's first general objection is that all three declarations improperly opine on ultimate issues of law. SCIF has several responses. First, it says that the declarations are aimed at satisfying the legal standards for a motion for reconsideration and thus are permissible. Second, SCIF says legal opinions are allowed in the context of this case. Specifically, SCIF analogizes this case to legal malpractice cases, where SCIF says experts are needed to establish the proper standard of care. SCIF says here experts are needed to establish the waivability of a conflict and the standard that a waiver has to meet. Finally, SCIF says that only "opinions phrased in terms of inadequately explored legal criteria" are barred.

Tantuwaya's second general objection is that the Levenson and Chemerinsky declarations lack foundation because they are based on incomplete information. SCIF says that Levenson and Chemerinsky have reviewed enough material to have foundation, and that at the very worst, Tantuwaya's arguments get to the weight the Court should give the evidence, and not its admissibility.

Tantuwaya's third general objection is that the Levenson and Chemerinsky declarations are contradictory of views Levenson and Chemerinsky have expressed elsewhere. SCIF argues that this objection isn't a valid evidentiary objection.

Besides filing responses to Tantuwaya's objections, SCIF filed its own objections to evidence Tantuwaya submitted. In sum, SCIF objects that Tantuwaya tries to introduce improper hearsay statements through the declarations of Albert Luna and M. Cris Armenta and the attached exhibits.

The Court finds that all the objections largely go to weight and thus overrules the objections. But the Court notes that even if it resolved all of both sides' evidentiary objections entirely in SCIF's favor, SCIF would still lose. With the evidentiary issues addressed, the Court turns to the merits.

### 4.2.2 Local Rule 7-18(c)

First, SCIF moves for reconsideration under Local Rule 7-18(c). A motion for reconsideration brought under Local Rule 7-18(c) must show that the court failed to consider material facts presented to the court before it made its initial decision. *See* L.R. 7-18(c). "No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." *Id.*

SCIF has done nothing it's supposed to do and everything it's not supposed to do under Local Rule 7-18(c). SCIF hasn't pointed to a single fact that was before the Court that the Court failed to consider. Instead, SCIF has just taken its opposition to the Motion for Disqualification (8 pages, plus 16 pages of declarations) and beefed it up into the Motion for Reconsideration (14 pages, plus 145 pages of declarations and exhibits). This opinion already identified many potential issues with the newly included "evidence." But on top of all that, and most relevant here, the vast majority of it consists of arguments about the law—not facts—and the application of that law here. Although even new legal arguments here would seem to fall outside of what Local Rule 7-18(c) requires, here there isn't even that. Instead, SCIF merely uses more words—and bigger names—to make the exact same legal arguments that it already made, the Court already considered, and the Court already rejected. The Court issued a lengthy tentative order after SCIF filed its opposition to the motion to disqualify hearing. The Court issued another lengthy order posing questions for the parties before the

Motion for Reconsideration opposition and reply were due. Despite all that guidance from the Court, not only does SCIF's Motion for Reconsideration "repeat . . . oral or written argument made . . . in opposition to the original motion"—that's all it does. L.R. 7-18. This by itself is sufficient grounds for the Court to deny reconsideration.

### 4.2.3 Clear Error or Manifest Injustice

Second, SCIF moves for reconsideration under case law, arguing that this Court "committed clear error or the initial decision [to disqualify] was manifestly unjust. *See In re Hewlett-Packard Co. Sec. Litig.*, No. SACV 11-1404 AG (RNBx), 2013 WL 3582761, at *1 (C.D. Cal. June 17, 2013).

SCIF doesn't clear the standard that it acknowledges "properly" presents "a high hurdle." Even if the Court set aside SCIF's failure to satisfy Local Rule 7-18(c), SCIF hasn't satisfied its burden to demonstrate that this Court committed clear error or that its order disqualifying SCIF was manifestly unjust. Put simply, SCIF still hasn't adequately addressed many of the Court's concerns, even now, months after the motion for disqualification, with unusually detailed guidance from the Court, and with multiple shots at the goal.

The Levenson, Chemerinsky, and Pansky declarations all offer examples of this. As respected as those authorities are, they implicitly and explicitly reveal many of the weaknesses in SCIF's arguments, and ignore important questions about the law and the application of that law to these particular facts. None offer anything new for the Court to consider that it hasn't already. First, the Pansky declaration. There's a lot to discuss.

71

For starters, the Pansky declaration, like the others, provides only a summary analysis. The Court prefers brevity. But here the Court could not embrace the brevity it prefers because the complex facts required an extensive review. Likewise, the persuasiveness of the declarations was diminished without an extensive review. Only a summary analysis is possible in the four-and-a-half page Levenson declaration and the four page Chemerinsky declaration. That's not as facially apparent with the lengthier Pansky declaration. But less than four pages of that twenty-one page document attempt to analyze the issues discussed in this opinion. Of the remaining eighteen pages, about ten go to establishing Pansky's qualifications. Three list the facts from the case, untethered to any analysis. A little more than two list case law, untethered to any analysis. One lists the documents Pansky reviewed while preparing her declaration. Half a page summarizes the scope of Pansky's review and discusses what SCIF is paying her.

The substance of Pansky's analysis doesn't help much either. The declaration doesn't acknowledge a core issue. Is the *Klemm* bar on unwaivable concurrent representation limited to representation of adverse parties in contested trials or hearings within the same case (such that, for example, an attorney can represent adverse parties in a deposition)? The declaration simply glosses over that important issue.

The declaration also ignores the actual text of the waivers. Among other things, the declaration doesn't acknowledge that five of the seven waivers only apply to "unrelated" cases. Nor does the declaration address how the cases at issue here could possibly be unrelated.

The declaration also puts forth the ever-popular conflict-counsel cure-all, again without explaining how that solution practically would work before and at trial, and how that

72

solution avoids running afoul of the hot potato rule, or how that solution avoids creating an even worse mashed potato mess.

The two pages of untethered case law deserve some more discussion. The presentation of the case law is at times not on point.

For example, Pansky cites the California Court of Appeal's decision in *Dino v. Pelayo*. *Dino v. Pelayo*, 145 Cal. App. 4th 347 (2006). She quotes *Dino* when she states that "[t]he Courts in California have consistently held that 'before disqualification of an attorney is proper, the complaining party must have or have had an attorney-client relationship with that attorney.'" Disappointingly, this quotation leaves out the important qualifier "generally." *See id.* at 352. In fact, *Dino* goes on to quote (and seemingly adopt) case law providing that there doesn't need to be an attorney-client relationship for standing to exist. *See id.*

Similarly, Pansky spends most of a paragraph discussing the California Court of Appeal's decision in *Zador Corp. v. Kwan*. *See Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285 (1995). But *Zador* is a successive representation case, not a concurrent representation case. The applicable rules and underlying concerns are different.

The Levenson and Chemerinsky declarations share some of these issues, and also present their own unique problems best left unaddressed here. Neither addresses the *Klemm* issues already discussed. Neither addresses the text of the waivers, and in particular the "unrelated" issue. These sorts of problems further erode the persuasive value of the declarations. The Court has immense respect for these authorities, but their analysis here is simply unpersuasive, even assuming the Court set aside SCIF's failure to satisfy the requirements for a motion for reconsideration. The Motion for Reconsideration fails.

**5.     CONCLUSIONS AND DISPOSITION**

        While the Court is confident of this ruling, it is equally confident of the continuing
correctness of its earlier rulings.

        The Court doesn't know what motivated Hueston Hennigan to concurrently
represent SCIF and Randall in the same litigation. Regardless, "the attorneys actual intention
and motives are immaterial" to whether the rule of automatic disqualification applies. *SpeeDee
Oil*, 20 Cal. 4th at 1147. "'The rule is designed not alone to prevent the dishonest practitioner
from fraudulent conduct,' but also to keep honest attorneys from having to choose between
conflicting duties, or being tempted to reconcile conflicting interests, rather than fully
pursuing their clients' rights." *Id.* (quoting *Anderson v. Eaton*, 211 Cal. 113, 116 (1930)). In
other words, it's there to protect the best of us from the worst in us.

        This disqualification likely caused and will continue to cause grief to lots of people.
Of course there's SCIF and Hueston Hennigan. SCIF is left trying to get its new counsel up
to speed on about three years of litigation involving dozens of defendants and opposing
attorneys, while Hueston Hennigan must drop a likely lucrative matter from its billing. But
there are others too. Randall is left with uncertainty about his legal representation while he
has to prepare for a life-altering sentencing hearing. And the Hueston Hennigan
attorneys—in particular those in the trenches, who worked passionately on this case for years
and who had nothing to do with the representation decisions—have had the rug pulled out
from under them, and have had to drop a case they likely lived with for years. Even the civil
defendants and their lawyers will have to do some shuffling to deal with the new folks on the
other side of the courtroom.

74

The Court did not enter its disqualification order lightly. The Court understood the costs, financial and otherwise, of disqualification here. But the Court also understood the price of not disqualifying Hueston Hennigan.

This opinion ends where it began: with loyalty. For the layperson, loyalty might be just one of many desirable characteristics. For lawyers—the keepers of confidences both private and public—loyalty is the basic job requirement. Rarely can it be compromised, and never without a careful look at the consequences to the clients, the courts, and the ability of our system to achieve justice.

Hueston Hennigan remains disqualified.

IT IS SO ORDERED.

DATED: June 24, 2016

_____

Andrew J. Guilford

United States District Judge

75